## ELLIS v. RAFFERTY.

(Circuit Court of Appeals, Third Circuit. September 25, 1912.)

No. 1,615.

BANKRUPTCY (§ 318*)—CLAIMS—PURCHASE OF BANKRUPT'S PROPERTY—TAXES AND WATER RENTS—LEASES.

A bankrupt had a long lease of the business premises occupied by it, which provided that the landlord might terminate it in case of the tenant's bankruptcy, and also required that the tenant pay city and county taxes and water rents as "additional rent." Certain prospective purchasers, in order to induce a receiver to sell the bankrupt's good will and stock in trade, entered into a combination to purchase the same, and falsely informed the receiver that the landlord had granted a new lease. The bid for the property provided that, in case of sale, the estate should be released from the payment of the "rent" on and after the date the sale was consummated. The bid having been accepted, the actual purchaser took possession, and later was compelled to accept a new lease from the landlord on terms less favorable than the old one, and, in order to obtain the same, was required to pay the accrued taxes and water rents which accrued after the sale; the landlord agreeing that he would claim reimbursement therefor for the purchaser's benefit from the bankrupt's estate. Held that, under the purchaser's bid, the estate was not liable to reimburse him for the taxes and water rents so paid, and that the landlord was therefore not entitled to the allowance of such claim.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 481, 482; Dec. Dig. § 318.*]

Appeal from the District Court of the United States for the Western District of Pennsylvania.

Claim of Gilbert T. Rafferty for taxes and water rents, presented in the interest of M. L. Roth, purchaser of the bankrupt's property, to which A. C. Ellis, trustee of the Boyd Clothing & Suit Company, filed objections. From a decree overruling the referee's finding disallowing the claim, and allowing the same, the trustee appeals. Reversed and remanded, with instructions.

Charles H. Sachs, of Pittsburgh, Pa., for appellant.

Joseph Stadtfeld, of Pittsburgh, Pa., for appellee.

Before GRAY, Circuit Judge, and McPHERSON and RELLSTAB, District Judges.

RELLSTAB, District Judge. The appellant is the trustee of the estate of the Boyd Clothing & Suit Company (corporation), and the appellee is the landlord of the premises which were occupied by the bankrupt. The question raised by the record is whether the appellee is entitled to recover from the estate the sum of $2,-646.31, a part of the taxes assessed against said premises for the year 1911, and the sum of $158.32, water rent affecting the same premises.

It is conceded that such claim is presented solely in the interest of Mr. M. L. Roth, the purchaser of the bankrupt's property, who paid such taxes and water rents as a condition to obtaining the lease for the premises. The referee disallowed the claim on the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ground that it had been paid by Roth pursuant to the agreement between him and the receiver as part consideration for the sale of the bankrupt's property. The District Court reversed the referee's findings, and allowed the claim on the ground that by the terms of the lease such taxes and water rents became due and owing by the bankrupt, and that the advances made by Roth in procuring the new lease were not as payment of such claim. It is also conceded that except for the transactions involving the sale of the bankrupt's property, and the making of a new lease between the purchaser thereof and the appellee, the latter's claim would have been a charge upon the estate.

At the time the petition in bankruptcy was filed—May 29, 1911 —the bankrupt was in possession of the premises by virtue of a lease dated August 25, 1910, having an unexpired term of nearly 10 years, but forfeitable at the option of the landlord upon inter alia the filing of such a petition. In addition to the definite yearly rent reserved, payable monthly, this lease required the bankrupt to pay, inter alia, the water rent and the city and county taxes assessed against the leased premises, which charges, with others imposed upon the tenant, the lease referred to as "additional rent." The city taxes were to be paid on or before March 31st, and the county taxes on or before August 1st, in each year. No specific date was named for the payment of the water rent; the requirement in that behalf, as in regard to gas and electricity, being in the following language:

"This additional rent to be due and payable when from time to time such respective debts, claims and assessments shall become payable."

At the time of the filing of such petition the bankrupt had not paid the water rent claimed; but whether it was the entire rent for the current year, and when it was payable, does not appear. The taxes, under the city's regulations, were payable in two installments, one in March and the other in September. The bankrupt had paid the March installment, and, if that covered all the taxes payable in March according to the terms of the lease, the bankrupt had not defaulted in the payment of taxes.

The appellant, as receiver of the bankrupt's estate, was in possession of the leased premises and the bankrupt's property contained therein from May 31, 1911, until the 7th day of July following, when he sold the bankrupt's stock, fixtures, and good will to M. L. Roth for $18,500. No bill of sale or other writing evidencing the transfer of title was given by the receiver, the title being transferred by a physical delivery made on the leased premises to which the receiver and purchaser had repaired on July 7, 1911, immediately following the court's confirmation of the receiver's acceptance of a private written bid, of which the following is a copy: ·

"A. C. Ellis, Esq.,                                                         July 7th, 1911.
    "Receiver, 301 Renshaw Bldg., Pittsburgh, Pa.
    "Dear Sir: We herewith submit an offer of eighteen thousand five hundred dollars ($18,500) for the entire stock of merchandise, fixtures and good will

of the Boyd Clothing and Suit Company, at No. 221 Fifth Avenue, Pittsburgh, Pa., including all goods in storage, conditioned upon the same being accepted on or before July 7, 1911, the estate to be released from the payment of rent on and after the date of the confirmation of the sale to the undersigned.

"Respectfully yours,                                    Horn Bros."

The receiver did not know that Roth was to be the purchaser until after his acceptance of Horn Bros.' bid was confirmed. Previous to any negotiations for sale, Roth aided the members of the bankrupt corporation in an endeavor to effect a composition with its creditors. This failing, he and Horn Bros. became prospective purchasers. However, instead of acting independently and competing with each other, they entered into an agreement whereby only Horn Bros. were to bid, and who, in the event of securing an acceptance of their bid, were to turn it over to Roth for the consideration of $1,000. In pursuance of such agreement, the attorney of Horn Bros. began negotiations with the receiver, and submitted several bids in their name. W. R. Boyd, the secretary of the bankrupt, was a party to this arrangement between Roth and Horn Bros. and the subsequent negotiations with the receiver for the purchase of such property. Boyd's identification with, and interest in, such combine, is well shown in the following excerpt from his testimony:

"Q. You were familiar with the purchase of the stock by Mr. Roth?    A. I was.

"Q. How did you get your knowledge about it?    A. I was there during the negotiations between them.

"Q. Between whom?    A. Between Alpern, Horn Bros., Roth, my brother, and myself.

"Q. State what took place?    A. Well, we were trying to buy the stock of goods belonging to the Boyd Clothing & Suit Company, and Mr. Roth offered to put up the money to buy it. We employed Alpern as attorney to make the negotiations with Mr. Ellis. We also agreed to pay Horn Bros. a certain fee, provided the sale was made—(interrupted). (Objected to as incompetent and irrelevant, as having no effect on the landlord's claim.) We made three different bids with Mr. Ellis for the goods, and he finally accepted $18,500, and Mr. Roth gave his check for it."

Boyd's interest did not end with the sale, but continued until after Roth had obtained a new lease for the premises from the landlord. Horn Bros., it will be noted, made no offer to the receiver for the unexpired term of the lease, and the latter made no attempt to sell it. That such unexpired term was a valuable asset is established by the new lease subsequently entered into between Roth and the landlord, as it provided for a shorter term with increased rent, and that such asset might have inured to the benefit of the estate is properly inferable from the testimony of J. W. Stoner, attorney of the landlord, who, in response to the referee's questioning about the making of a new lease, testified as follows:

"Q. Did Mr. Roth make his application to continue the Boyd lease, or did you head that off, and state you would not do it?    A. The application first made by Mr. Roth, together, however, with Boyd, was to continue the old Boyd lease.

"Q. And objection was made to that by you on behalf of Mr. Rafferty? A. Yes; but I may say, if your honor please, that we would have continued under the lease.

"Q. There were lengthy negotiations between Mr. Rafferty and Mr. Roth looking to the continuation of the old lease? A. Yes; between his agents."

During the negotiations for the sale of the property, the attorney for the bidder told the receiver that a lease had been signed for the premises; and the latter's failure to ascertain from the landlord whether he would forego his right to terminate the lease and permit a sale of the unexpired term would be inexplicable, save for such statement. This statement, it was subsequently learned, was not true so far as the landlord's signing was concerned, but it sufficiently accounts for the absence of any negotiations by the receiver to turn such unexpired term into an asset of the estate. That Roth, Boyd, and Horn Bros., as well as their attorney, fully expected to take over the premises under the old lease or under a new one upon favorable terms, is probable, else why their bargaining for the "good will" and the offer to release the estate from the payment of future rents? This "good will" would be seriously impaired, if not wholly destroyed, if the prospective purchaser could not continue the business on the leased premises, and the clause releasing the estate from the rents accruing after the sale would be a gratuitous burden upon the bidder if the latter did not take the bankrupt's place as tenant. Roth's expectation in this behalf, however, did not materialize, either in respect to continuing under the old lease or under a new one on as favorable terms. He continued in possession of the premises, however, for more than two months, making efforts to secure a new lease, and it was not until October 3, 1911, that he obtained it. This lease, as already observed, was for a much shorter term and at a considerably higher yearly rental than the one with the bankrupt. Whether in other respects it compared as favorably for the landlord as the old lease does not appear.

In the negotiations for the new lease, the landlord insisted as a condition for granting it at all, that Roth not only pay for the use of the premises from the time he took possession, at the rate of rent reserved, but also the amount of such September installment of city taxes and county taxes then past due, and the water rents as provided in the old lease. This, though strenuously opposed by Roth, was eventually acceded to, the landlord agreeing in consideration thereof to present a claim to the trustee for such taxes and water rents, and to turn over to Roth whatever he received from the estate on account thereof. Upon the payment of such moneys, the landlord gave Roth a writing which embodied a receipt of such payment and his said agreement in respect thereof, of which the following is a copy:

"$6569.03. Pgh., October 3, 1911.

"In full for rent of premises No. 221 Fifth avenue, Pittsburgh, from July 13th, 1911. to November 1st. 1911, and including the sum of $2804.63 covering Sept. inst. city taxes 1911, county taxes 1911, and water rent 1911 for said premises. For the said latter sum of $2804.63 I agree to file a claim in bankruptcy against the Boyd Clothing & Suit Company, former tenants of said building, and if collected, or to any extent collected. will repay the same to said M. L. Roth. [Signed] G. T. Rafferty."

The claim now under consideration was presented pursuant to said agreement.

In our opinion the liability of the estate to pay this claim is not to be determined solely by the terms of the lease between the landlord and the bankrupt, but primarily by the terms of sale of the bankrupt's property, and, secondarily, by the attitude of the landlord in accepting the purchaser of such property as tenant in place of the bankrupt. As will presently be shown, neither the taxes nor water rents claimed can be said to have been due at the time the sale was made. The receiver did not have possession of the premises after the sale, and made no claim to the lease at or after such sale. That the payment of taxes and water rents came due before the landlord annulled the old lease by granting a new one, and that he could have successfully presented his claim for such taxes and water rent against the estate if he had not received the amount thereof from the new tenant, is not decisive, for he was paid such taxes and water rent by the new tenant, and as he is admittedly pressing this claim against the estate not for himself, but to reimburse Roth under the arrangement made with him when he, in the exercise of his option to terminate the old lease, granted a new one, the estate's liability to respond to such claim is to be measured by Roth's right thereto founded on the terms of his purchase, and not the agreement of the landlord. If Roth could not have directly maintained a claim for such moneys against the estate, he cannot receive the same indirectly. The receiver was not a party to such new lease nor to the arrangement concerning the payment of such taxes, and the estate cannot be bound thereby. However, it is bound to carry out the terms of the sale, and Roth's right to protection from the payment of such taxes and water rents under such terms will be considered, though he has seen fit to seek reimbursement, not on the ground that to protect his purchase from the estate he was compelled to pay what the estate should have paid under such terms, but on the ground that the landlord was entitled to it under his lease with the bankrupt.

The determining question, therefore, is, Was Roth under obligation to pay such taxes and water rents? If not, he should be reimbursed for the moneys paid on account thereof, for such payment was not voluntary, but forced, in order to protect his purchase of the good will of the bankrupt's business. We concur in the findings of both the referee and the District Court that Alpern in his negotiations with the receiver acted as the attorney for Roth as well as Horn Bros. Roth is therefore to be treated, not as an innocent purchaser taking over the property from Horn Bros. without knowledge of the terms of sale, but as one for whose benefit the bargaining took place, and he is bound by all its terms. The trustee says that he had not seen the lease, and knew nothing of its terms, and that at the time of sale he believed the estate owed the landlord only the rent for June and the first six days in July. In response to the question, "What were the terms of sale?" he replied: "Possession was to be given on the morning of the 7th of July, and the purchaser was to keep the estate free and harmless from any obligation of the leasehold from that time on." This statement is not contradicted by Alpern. On the contrary,

it is, in effect, corroborated by the latter's testimony, the written offer and the conduct of the purchaser before and after the sale. The purchase of the lease from the receiver was not considered. Alpern gives the reason for this in the following excerpt from his testimony:

"Q. Was the lease sold at that time? A. The lease was not sold.

"Q. Was there any agreement at all to give possession under that lease? A. The reason that the lease was not sold was this: At the time negotiations were had with the receiver a lease had been signed by Messrs. Roth and Boyd for the same premises, and I so informed the receiver at the time we closed up, that a lease had been signed up. I don't know whether I told him Roth and Boyd had signed it, but I told him a lease had been signed.

"Q. But no lease had been signed by Mr. Rafferty? A. I understood not."

The bid, as already noted, is based on the idea that the purchaser is to take over the premises by an arrangement with the landlord. Boyd, who was acting in concert with Roth preliminary to and pending the negotiations with the receiver, and who, after the sale, was treated by the landlord in his dispossession notice, as a joint occupant with Roth of the premises, knew that the taxes and water charges in question were considered by the lease as rent, and that only the March installment of such taxes had been paid. Alpern, who had heard Boyd say that he had not paid all the taxes, testified that he did not know whether he told Horn that he (Alpern) understood the taxes were paid, but he thinks he "told Mr. Ellis (receiver) that the record showed that the taxes (September installment) were paid." He makes no answer to the inquiry made by the attorney for the landlord whether he or Horn made any agreement to pay the taxes, but under cross-examination recalls "that one of the inducements" held out to the receiver for his accepting the bid was "that the estate would be relieved of all liability under the lease with the exception of the rent up until the date that they were to take possession."

While rents do not ordinarily embrace taxes, there is no legal reason why the parties may not consider and include the payment of taxes, water charges, and municipal assessments generally in fixing the return to be made the landlord for the use of the premises. That the taxes and water rents were so treated in the lease to the bankrupt, and therein specifically referred to as "additional rents" has been shown, and that Roth and his attorney, as well as Boyd, knew that the payment of taxes and water rents were made rents in such lease, is not open to serious doubt. The prospective bidders, with Boyd, the bankrupt's secretary, as their adviser, were very desirous to get possession of the premises under the old lease. Its terms and conditions were, of course, well known to Boyd, and it is inconceivable that, in fixing the several bids submitted to the receiver, which were conditioned on releasing the estate from future rents, the exact rentals were not known and considered by the bidder. With this knowledge, the word "rents" in the bid included taxes and water rents, and the acceptance of the bid was conditioned on the purchaser paying all such taxes and water rents as well as the monthly installment of the specific yearly reservation that was to accrue from that date.

If the March installment of taxes paid by the bankrupt before the filing of the petition in bankruptcy is the March payment specified

in the lease, and which, in the absence of evidence to the contrary will be presumed, no taxes were payable by the receiver, as, both by the terms of the lease and the city regulations, the next installment would fall due after the sale, and by the undertaking of the purchaser, they were to be paid by him.

Concerning the water rents. The lease fixes no specific date when they were to be paid, and, as the testimony does not disclose whether the amount claimed covers the entire year or when due and payable, the claim in respect thereto must fail for want of proof. The combination entered into between Roth, Boyd, and Horn Bros. preliminary to purchasing the bankrupt's property had for its object the purchase of the bankrupt's property at less than its market value. It was engineered by concealing from the receiver the real purchaser, and accomplished by stifling competition, necessarily resulting to the disadvantage of the estate. The $1,000 paid to Horn Bros. was not, as alleged, a profit derived from an advantageous bargain made with the receiver, but the price which the purchaser was willing to give for the greater benefit to be realized by him in getting rid of them as competitors for the property, and the inference is justified that such $1,000 was but the minimum loss sustained by the estate in the sale. Furthermore, in carrying such scheme into effect, the estate probably lost an additional sum through the representation of the attorney that a lease had been signed for the premises. If the landlord had accepted Roth as his tenant under the terms of the old lease, as contemplated by the combine, the present claim would in all probability never have been heard from. That the landlord's refusal to co-operate with the bidder's expectation prevented the purchaser from getting all the anticipated benefits of the combination is no reason why the bidder should be relieved of the obligation of his bid. To allow this claim would not only be contrary to the intention of the parties, but, in the circumstances, an encouragement to similar stifling of competition in the sale of bankrupts' estates.

The decree of the District Court is reversed, and the cause remanded, with instructions to dismiss the claim.