78 F.3d 585
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Tore B. NORDAHL, Plaintiff-Appellant,
v.
STUDER REVOX AMERICA, INC., a foreign corporation, Studer
Capital Corporation, a Tennessee corporation, Studer Editech
Corporation, a foreign corporation, and Studer Revox AG, a
foreign corporation, Defendants-Appellees.
 No. 94-6336.
 United States Court of Appeals, Sixth Circuit.
 March 5, 1996.
 
 Before: MARTIN, GUY, and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 The plaintiff, Tore Nordahl, filed suit alleging national-origin discrimination in violation of Title VII, 42 U.S.C. § 2000e, and various state-law claims arising out of the termination of his employment by the defendants, Studer Revox AG and its United States subsidiaries. The district court granted summary judgment as to all counts in favor of the defendants, and on appeal, the plaintiff argues that the district court erred in a variety of ways. We disagree, and will affirm.
 
 I.
 
 2
 Studer Revox AG (SRAG), a Swiss manufacturer of professional audio equipment, hired Tore Nordahl to manage its three United States subsidiaries, Studer Revox America, Inc. (SRA), Studer Capital Corporation, and Studer Editech Corporation. Both SRA and Studer Capital are located in Nashville, Tennessee; Studer Editech is in California. Nordahl, a Norwegian national who became a naturalized United States citizen during the pendency of this case, had long been involved in the audio industry. Individuals at SRAG began soliciting him in 1988, and on October 7, 1988, he met with Bruno Hochstrasser in Regensdorf, Switzerland and signed an employment contract with SRA. Pursuant to the contract, Nordahl served as vice president general manager of SRA from October 1, 1988, and as president beginning April 1, 1989. He was based in Nashville for the entire period of his employment with SRA.
 
 
 3
 Nordahl drafted the contract following his negotiations with Hochstrasser, and according to Nordahl, the contract fully represented their agreement. The contract provided that Nordahl would be paid an annual salary of $96,000, along with commissions and various fringe benefits. His annual salary was increased from time to time, and by the end of his employment with SRA, his base salary was $145,000. Although Nordahl asserts that Hochstrasser and another principal of SRAG told him, a month and a half prior to execution of the contract, that they would "protect [his] career, [and would] not terminate [him] unless [they had] good reason," the contract only provided as follows with respect to termination:
 
 
 4
 Both parties agree that this employment relationship is intended to be for the longer term. However, in the event one of the parties wishes to terminate the employment relationship, ... [t]he agreement can be cancelled by notice in writing by either party with:
 
 
 5
 --90 days notice prior to March 31, 1989.
 
 
 6
 --180 days notice thereafter.
 
 
 7
 There is evidence in the record that at the time Nordahl entered into this employment contract, Studer Revox's position was being eclipsed by its competitors, due to its late entry into the digital audio technology market. In 1988, SRA lost approximately $1,000; in 1989, $31,000; and in 1990, $1 million. Between 1990 and 1992, SRA reduced its workforce from 45 to 27. As a consequence of its declining position, the Studer Revox organization was put on the market in 1989, and it was purchased in April 1990 by Motor Columbus AG, a Swiss holding company.
 
 
 8
 Nordahl was terminated as president of SRA on October 11, 1991. His termination letter informed him that he would be relieved of his duties immediately, but that his salary would be paid for the next six months. At the time of his termination, Nordahl was paid nearly twice as much as anyone else at SRA. The letter is ambiguous as to whether SRA's asserted reason for terminating Nordahl was that it blamed him for SRA's losses, or that it could no longer afford to pay a salary of his magnitude:
 
 
 9
 [Y]ou are hereby notified that SRA desires to terminate your employment, effective 180 days from the date of this letter....
 
 
 10
 The reason for this termination is SRA's anticipated loss for this year, which we believe will exceed $1 million. This will be the poorest SRA performance in recent history.
 
 
 11
 Following Nordahl's termination, Hochstrasser became president of SRA. Nordahl's job responsibilities, however, were performed not by Hochstrasser, but were split between two existing SRA employees who had already been performing management work.
 
 
 12
 Nordahl filed suit on October 28, 1992. His Title VII claim was based on alleged national origin discrimination, specifically, on allegations that Studer Revox discriminated against all non-Swiss employees. He claimed his employment contract provided for just-cause discharge only, and that, moreover, his termination violated an implied covenant of good faith and fair dealing. His retaliatory discharge claim was primarily premised on an allegedly illegal land transaction of which he claimed to have complained to two Studer Revox principals. His fraudulent inducement claim was based on alleged misrepresentations by Hochstrasser at the time they entered into Nordahl's employment contract to the effect that Studer Revox's digital audio capabilities were greater than they actually were.
 
 
 13
 The defendants moved for summary judgment as to all of Nordahl's claims. The district court concluded that, under Tennessee law, Nordahl's contract was at-will, and that his theory of breach of an implied covenant of good faith was not available, because such a doctrine would conflict with Tennessee's strong policy of employment-at-will. The district court rejected Nordahl's Title VII claim on the ground that he failed to prove a prima facie case. The court rejected Nordahl's retaliatory discharge claim both on the merits, noting Nordahl's admission that no one ever asked him to engage in or remain silent about any illegal activity, and, alternatively, on statute of limitations grounds. Finally, the district court found that Nordahl's fraud claim was barred by the applicable statute of limitations. Nordahl filed a timely appeal.
 
 II.
 
 14
 This court's review of a district court's grant of summary judgment is de novo. See Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir.1995). In reviewing summary judgment motions, courts must view the evidence in the light most favorable to the nonmoving party, and determine whether all the evidence before the district court " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "Material facts are only those facts that might affect the outcome of the action under governing law." Talley, 61 F.3d at 1245 (citations omitted).
 
 
 15
 Subject matter jurisdiction in this case arises out of diversity of citizenship, 28 U.S.C. § 1332, and we therefore apply Tennessee law, including its choice-of-law provisions. Davis v. Sears, Roebuck & Co., 873 F.2d 888, 892 (6th Cir.1989); see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). This court reviews de novo the district court's determination of what Tennessee's substantive law is. J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1483 (6th Cir.1991).
 
 III.
 A.
 
 16
 Nordahl's Title VII claim alleges that SRAG's Swiss management discriminated against non-Swiss employees by choosing to terminate them rather than Swiss employees during a time of financial distress. In support, Nordahl points to various instances of what he asserts was general favoritism toward Swiss and animosity towards non-Swiss, as well as to incidents of what he contends constitute circumstantial evidence of discriminatory animus toward Nordahl due to his non-Swiss status.
 
 
 17
 In Title VII actions, the plaintiff bears the initial burden establishing a prima facie showing that the defendant discriminated. Talley, 61 F.3d at 1246. To do so, he may employ either of two methods: presenting direct evidence of intentional discrimination, or showing the existence of circumstantial evidence that creates an inference of discrimination. Id. Here, the plaintiff has not presented, and does not suggest that he has presented, any direct evidence of intentional discrimination. Thus, he must proceed under the second method.
 
 
 18
 Under the second method, a plaintiff must show that (1) he is a member of a protected group; (2) he was subject to an adverse employment decision; (3) he was qualified for the position; and (4) he was replaced by a person outside of the protected class. Id. "The fourth element may also be satisfied by showing that similarly situated nonprotected employees were treated more favorably." Id.
 
 
 19
 Despite expressing some well-founded skepticism as to whether the 5 billion people in the world who are not Swiss can be deemed a protected class, the defendants largely confine themselves to challenging the plaintiff's proof with regard to the fourth prong of his prima facie case. Proof of this fourth element is crucial, and Nordahl must be able to show either that he was replaced by someone outside the protected class, or that similarly situated individuals not in the protected class were treated more favorably. Id. at 1247 (citation omitted).
 
 
 20
 Nordahl argues that replacement is a finding of fact, not properly made at the summary judgment stage. Under the circumstances of this case, however, his assertion is incorrect. It is undisputed that, following his termination, Nordahl's duties were simply redistributed to two existing employees directly below him in the management hierarchy who had already been performing related management work. It is well-established that "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement." Lilley v. BTM Corp., 958 F.2d 746, 752 (6th Cir.), cert. denied, 506 U.S. 940 (1992); Barnes v. GenCorp, Inc., 896 F.2d 1457 (6th Cir.), cert. denied, 498 U.S. 878 (1990). Therefore, as a matter of law, Nordahl was not replaced.
 
 
 21
 Nordahl also cannot satisfy the alternative test, as there were no employees similarly situated to him. "[T]he necessary inference of discrimination cannot be established absent proof that other employees were similarly situated when that alternative is the only remaining avenue by which plaintiff could establish his prima facie case." Talley, 61 F.3d at 1247. In order to be similarly situated, it is clear that individuals must be "comparable[ ] ... in all respects." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992). Nordahl cannot show that he was treated differently from a similarly situated employee, because no employees were similarly situated with regard to pay or job duties.
 
 B.
 1.
 
 22
 In order to determine the merits of Nordahl's breach of contract and breach of implied covenant claims, we must first ascertain what law applies. Nordahl asserts emphatically that either Swiss or California law controls, not the "harsh" and "eccentric" law of Tennessee, but he does not favor us with any hint of what the Swiss or California law might be. See In re Grand Jury Proceedings, 40 F.3d 959 (9th Cir.1994), cert. denied, 115 S.Ct. 2558 (1995). As it develops, that omission is of no consequence, because Tennessee law controls.
 
 
 23
 The Tennessee Supreme Court's most recent pronouncement with regard to choice of law in a contract dispute is found in Ohio Casualty Insurance Company v. The Travelers Indemnity Company, 493 S.W.2d 465 (Tenn.1973). Although stating that "[i]t is a familiar rule in Tennessee that the construction and validity of a contract are governed by the law of the place where the contract is made," id. at 466, thus suggesting that Swiss law should apply here, the Ohio Casualty court went on to quote the following language with approval:
 
 
 24
 "The Tennessee conflict of laws rule provides that rights and obligations under a contract are governed by the law of that state with the view to which it is made and that the intentions of the parties in this respect to be gathered from the terms of the instruments and all of the attending circumstances control. Bowman v. Price, 143 Tenn. 366, 226 S.W. 210 [ (1920) ]; Deaton v. Vise, 186 Tenn. 364, 210 S.W.2d 665, 668 [ (1948) ]. The Supreme Court of Tennessee, in the latter case, said:
 
 
 25
 " ' * * * a contract is presumed to be made with reference to the law of the place where it was entered into unless it appears it was entered into in good faith with reference to the law of some other state.' "
 
 
 26
 Id. at 466-67 (quoting First American Nat'l Bank of Nashville v. Automobile Ins. Co., 252 F.2d 62 (6th Cir.1958)). In other words, as noted by another Tennessee court, Tennessee generally applies the lex loci contractus rule, but "in certain situations, the law of the place of performance will be applied instead of the traditional rule." Solomon v. FloWarr Management, Inc., 777 S.W.2d 701, 705 n. 5 (Tenn.Ct.App.1989). The pertinent consideration is whether a contract was "entered into in good faith with reference to the law of some other state," that is, whether it was made "with a view" to another state. Ohio Casualty, 493 S.W.2d at 466-67.
 
 
 27
 We conclude that the Supreme Court of Tennessee would apply the law of Tennessee to interpret the employment contract in question, as the circumstances demonstrate that the contract was entered into with reference solely to Tennessee. There is absolutely no reason why the parties would have intended Swiss law to apply. As Nordahl himself acknowledges, it was a fluke that the contract was executed there, as the parties intended to sign the contract in California. Likewise, California law cannot reasonably apply, as there is an utter absence of connection to that state: the contract was neither executed nor performed there. Instead, it seems quite clear that Tennessee, where the contract was to be wholly performed, was the state with reference to which the contract was entered. Tennessee law, accordingly, controls.
 
 2.
 
 28
 Nordahl contends that the language in his contract referring to the parties' intention to form a "long[ ] term" relationship, the fact that the contract stated an annual salary, and Hochstrasser's oral representations that Nordahl would be terminated only for cause, all demonstrate that he was not an at-will employee. Nordahl also points to minutiae in his contract which he contends are provisions that were breached by SRA separate and apart from the termination; however, he fails to point to any evidence in the record that would support the existence of the claimed breaches.
 
 
 29
 Tennessee is an employment-at-will jurisdiction where, as a general matter, an employer may fire an employee for good cause, for no cause, or even for a cause that is morally wrong. See Whittaker v. Care-More, Inc., 621 S.W.2d 395, 396 (Tenn.Ct.App.1981). In Tennessee, a contract for permanent employment is considered an indefinite hiring terminable at the will of either party. Id. Tennessee courts have interpreted contracts for the "long term" as being contracts for permanent employment, and thus at-will contracts. D'Andrea v. Plough Sales Corp., 107 Lab.Cas. (CCH) P55,834 (Tenn.Ct.App.1987). Nonetheless, Tennessee courts have construed contracts containing salaries based on an annual amount to constitute a hiring for a one-year period. See Delzell v. Pope, 294 S.W.2d 690 (Tenn.1956); Ward v. Berry & Associates, Inc., 614 S.W.2d 372 (Tenn.Ct.App.1981). However, "the time of payment is not conclusive that the parties have agreed the employment is to continue for the pay period but it is to be considered along with other relevant facts." D'Andrea, supra. Tennessee law is clear that oral representations allegedly made prior to the preparation and execution of the employment contract can have no effect, as any such representations are "merged" into the final written contract, which is deemed to represent the whole of the parties' understanding. Turner v. Zager, 363 S.W.2d 512, 517 (Tenn.App.1962).
 
 
 30
 It is evident that, under Tennessee law, Nordahl's contract claim must fail. The language of his contract is, at best, that of "permanent" employment. A contract for permanent employment is deemed to be a contract of indefinite duration. A contract of indefinite duration is deemed to be one terminable at the will of either party. Indeed, there can be no question that a contract providing that either party may terminate the contract when he or it "wishes" is an at-will contract. Moreover, the alleged representations of Hochstrasser are of no avail, since they occurred before the execution of the contract. As such, they are "merged" into the written contract, so that its terms supersede.
 
 3.
 
 31
 Nordahl argues, as an alternative to his breach of contract claim, that Tennessee law implies a duty of good faith and fair dealing in every contract, and that because SRA terminated him either for discriminatory or retaliatory reasons, it must surely have breached that duty. Tennessee law does not, however, recognize a claim for breach of an implied covenant of good faith and fair dealing in the employment context. Whittaker, 621 S.W.2d at 396-97; see Shelby v. Delta Air Lines, Inc., 842 F.Supp. 999, 1014 (M.D.Tenn.1993), aff'd mem., 19 F.3d 1434 (6th Cir.1994). Even if Tennessee were to recognize a claim of that nature, however, Nordahl's claim must fail because it relies on either his discrimination or his retaliation claim for validity. As we have already held, his Title VII claim is without merit, and as we shall explain below, so is his retaliation claim. Given that his good-faith claim lives or dies with those two claims, it must, necessarily, die.
 
 C.
 
 32
 Nordahl asserts that he "protested four unlawful acts" by Studer Revox during his employment; that his protests soured his relationship with management; and that accordingly, he had stated a claim for violation of Tennessee's retaliatory discharge statute. He also disputes the district court's conclusion that his claim was time-barred, describing it simply as a "doubtful proposition" that a one-year statute applies, and suggesting that the statute should start running at the date he received his last paycheck, which was six months after his actual termination.
 
 
 33
 On March 29, 1990, the Tennessee legislature enacted a statute prohibiting employers from firing employees who refuse to engage in, or remain silent about, the employer's illegal activities. TENN.CODE ANN. § 50-1-304. It is well-settled in Tennessee that the one-year statute of limitations prescribed by TENN.CODE ANN. § 28-3-104, governing damages to the person, applies to retaliatory discharge claims. See Bennett v. Steiner-Liff Iron & Metal, 826 S.W.2d 119, 121 (Tenn.1992); Headrick v. Union Carbide Corp., 825 S.W.2d 424, 426 (Tenn.Ct.App.1991); Brooks v. Philips Consumer Electronics Co., No. 03A01-9501-CV-00035, 1995 WL 416955 at * 4 (Tenn.Ct.App. July 14, 1995). It is likewise well-established that an employee's cause of action accrues at the time he learns of his termination, not at the time he receives his last paycheck. Webster v. Tennessee Board of Regents, 902 S.W.2d 412, 414 (Tenn.Ct.App.1995) (citing Delaware State College v. Ricks, 339 U.S. 250, 258 (1980)); Weber v. Moses, No. 02A01-9407-CH-00173, 1996 WL 16650, at * 3 (Tenn.Ct.App. Jan. 17, 1996).
 
 
 34
 Thus, it is plain that Nordahl's retaliatory discharge claim is barred by the statute of limitations. The time for filing began to run on October 11, 1991, when he received written notice of his termination, rather than six months later, when he received his last check, and it had expired by the time he filed suit on October 28, 1992.
 
 D.
 
 35
 Finally, Nordahl's fraudulent inducement claim is also time-barred. His fraud allegations depend on the fact that Hochstrasser told him that certain products would be available at certain times, but they were not, and on the testimony of a Swiss manager, who told him in 1991 that Hochstrasser deliberately misrepresented product delivery schedules "to protect his own position." Nordahl puts these two pieces of information together to conclude that "he had been deliberately lied to in order to induce him to join Studer Revox."
 
 
 36
 The statute of limitations applicable to a case of fraudulent inducement in Tennessee provides that such actions "shall be commenced within three (3) years from the accruing of the cause of action." TENN.CODE ANN. § 28-3-105; see Prescott v. Adams, 627 S.W.2d 134, 137 (Tenn.Ct.App.1981). The statutory phrase "from the accruing of the cause of action" has been construed to mean "from the time when the plaintiff knew or reasonably should have known that a cause of action existed." Stone v. Hinds, 541 S.W.2d 598, 599 (Tenn.Ct.App.1976); see Prescott, 627 S.W.2d at 138. Thus, the plaintiff's "cause of action accrues at the time the injury occurs, or when it is discovered, or when in the exercise of reasonable care and diligence the injury should have been discovered." Prescott, 627 S.W.2d at 138. To benefit from the discovery rule in the fraud context, "the plaintiff must prove that the defendant took affirmative action to conceal his cause of action and that he, the plaintiff, could not have discovered his cause of action despite exercising reasonable diligence." Vance v. Schulder, 547 S.W.2d 927, 930 (Tenn.1977).
 
 
 37
 Nordahl's suit was filed on October 28, 1992; thus, any claims of which he knew or which he should reasonably have discovered by or before October 28, 1989, are barred. As the defendants point out, as a self-described experienced senior executive in the industry, it is inconceivable that, after heading the company for more than a year, Nordahl would have remained ignorant of the company's finances, products, and customer relations record. Indeed, the defendants point to a wealth of evidence that demonstrates Nordahl's knowledge, three years before filing suit, of matters he now says were concealed from him. Even if he was, in fact, ignorant of the matters of which he complains, it is wholly inconceivable that he could not have uncovered the alleged fraud regarding the development schedule of one of SRA's major products if he had exerted even minimal effort. Indeed, he does not suggest that he exerted any effort to uncover the fraud. Under these circumstances, his claim is barred.
 
 IV.
 
 38
 We AFFIRM.