*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0126P (6th Cir.)
File Name: 04a0126p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TONYA COOPER,
      *Plaintiff-Appellee,*

      *v.*                          No. 02-5702

MRM INVESTMENT
COMPANY, TERRY ROGERS
and LARRY MAYS,
      *Defendants-Appellants.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 01-01596—John T. Nixon, District Judge.

Argued: October 23, 2003

Decided and Filed: May 3, 2004

Before: KENNEDY and GIBBONS, Circuit Judges;
      ALDRICH, District Judge.[*]

---

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

---

## COUNSEL

**ARGUED:** David W. Anderson, ENGLISH, LUCAS, PRIEST & OWSLEY, Bowling Green, Kentucky, for Appellants. William B. Ryan, DONATI LAW FIRM, Memphis, Tennessee, for Appellee. **ON BRIEF:** David W. Anderson, Regina A. Jackson, ENGLISH, LUCAS, PRIEST & OWSLEY, Bowling Green, Kentucky, for Appellants. William B. Ryan, DONATI LAW FIRM, Memphis, Tennessee, for Appellee. Robert J. Gregory, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., Ann Elizabeth Reesman, McGUINESS, NORRIS & WILLIAMS, Washington, D.C., for Amici Curiae.

---

## OPINION

---

ALDRICH, District Judge. This appeal concerns the validity and enforceability of an arbitration provision in an employment contract between plaintiff-appellee Tonya Cooper and defendant-appellant MRM Investment Company ("MRM"). Cooper alleges that while working as a manager at MRM's restaurant, she was sexually harassed and constructively discharged. She brought a Title VII action, and MRM moved to compel arbitration. The district court denied the motion, holding the arbitration agreement invalid or unenforceable on five grounds. The district court held that the arbitration provision is invalid as a matter of Tennessee law because it is an unconscionable contract of adhesion and is insufficiently bilateral, and invalid as a matter of federal law because it did not make clear that Cooper was waiving her right to a jury trial. The court also opined that as a matter of policy, Title VII claims belong in court, not in arbitration. For the reasons that follow, we reverse those portions of the district court's judgment.

The district court also held that the arbitration provision is unenforceable, as a matter of federal common law, because it incorporated American Arbitration Association ("AAA")[1] rules likely to impose undue costs on Cooper that she would not incur in court, rendering arbitration an ineffective forum to vindicate her rights. For the reasons that follow, we vacate this portion of the district court's judgment and remand for proceedings consistent with this opinion.

## I. BACKGROUND

Terry Rogers and Larry Mays are the sole shareholders of MRM, which owns and operates several Kentucky Fried Chicken/Taco Bell ("KFC") franchises. From January 3 through August 2000, Cooper worked as an assistant manager of MRM's KFC store in Waverly, Tennessee, at $400-450 per week plus possible bonuses. *See* J.A. 6-10, 17 and 90-91. On January 5, 2000, MRM required her to sign a document entitled "Arbitration of Employee Rights," which provides:

Because of the delay and expense of the court systems, KFC and I agree to use confidential binding arbitration for any claims that arise between me and KFC, its related companies, and/or their current or former employees. Such claims would include any concerning compensation, employment (including, but not limited to any claims concerning sexual harassment), or termination of employment. Before arbitration, I agree: (i) first, to present any such claims in full written detail to KFC; (ii) next, to complete any KFC internal review process; and (iii) finally, to complete any external administrative remedy (such as with the Equal Employment Opportunity Commission). In any arbitration, the then prevailing rules of the American Arbitration Association

---

[1] The AAA, a non-profit public service organization, assists in the design and administration of dispute resolution systems for corporations, unions, government agencies, law firms and the courts. *See McMullen v. Meijer, Inc.*, 355 F.3d 485, 487 n.1 (6th Cir. 2004).

(and, to the extent not inconsistent, the then prevailing rules of the [FAA]) will apply.

J.A. 23. *Compare Lee v. Red Lobster Inns of Am.*, No. 02-5188, 2004 WL 187564 (6th Cir. Jan. 27, 2004) (employee did not affirmatively agree to arbitrate her Title VII claims, because she did not sign handbook sheet agreeing to arbitration and none of the written materials distributed by the employer advised her that continuing her employment constituted assent to the arbitration policy). The parties agree MRM did not separately advise Cooper that she was giving up her right to a jury trial, nor did they provide her with a copy of the AAA's rules. *See* J.A. 17-18.

As a result of sexual harassment, Cooper alleges, she was forced to quit in August 2000. She found a job at another restaurant, where she earned $7,200 in 2001, and tended bar part-time, earning an additional $300 to $500 per week as of early 2002. In January 2001, Cooper filed a Charge of Discrimination with the EEOC, which issued a Dismissal and Notice of Rights in September 2001. Cooper filed her complaint in December 2001. Following oral argument, the district court denied MRM's motion to compel arbitration on May 1, 2002. MRM appealed on May 28, 2002.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* the district court's holding that the arbitration agreement is invalid and unenforceable. *See Great Earth Cos. v. Simons*, 288 F.3d 878, 888 (6th Cir. 2002). The court's factual findings, by contrast, will be set aside only if they are clearly erroneous:

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have

weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

*Harrison v. Monumental Life Ins. Co.*, 333 F.3d 717, 721-22 (6th Cir. 2003) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-75 (1985)).

## B. Arbitration Agreements are Generally Enforceable and are Strongly Favored

At common law, American courts were loathe to order specific enforcement of an agreement to arbitrate, adopting the "jealous notion held by the common law courts of England that arbitration agreements were nothing less than a drain on their own authority to settle disputes." *Raasch v. NCR Corp.*, 254 F. Supp. 2d 847, 853 (S.D. Ohio 2003) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219-20 n.6 (1985)). In response, Congress enacted the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("the FAA"), "to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The FAA expresses a strong public policy favoring arbitration of a wide class of disputes. It provides, in part:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*

9 U.S.C. § 2 (emphasis added); *see also* 9 U.S.C. § 1 (excepting some disputes arising out of employment in

interstate transportation). Thus, generally applicable state-law contract defenses like fraud, forgery, duress, mistake, lack of consideration or mutual obligation, or unconscionability, may invalidate arbitration agreements. *See Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687 (1996) (citations omitted); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987); *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 393-94 (6th Cir. 2003). "The federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law." *Garrett v. Hooters-Toledo*, 295 F. Supp. 2d 774, 779 (N.D. Ohio 2003) (citing *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1014 (6th Cir. 2003) (internal citation omitted)).

The Supreme Court has roundly endorsed arbitration and explained its benefits in the employment law context:

We have been clear in rejecting the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context. Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts. These litigation costs to parties (and the accompanying burden to the Courts) would be compounded by the difficult choice-of-law questions that are often presented in disputes arising from the employment relationship ... and the necessity of bifurcation of proceedings in those cases where state law precludes arbitration of certain types of employment claims but not others. The considerable complexity and uncertainty that [a broader reading of § 1's exclusion] would introduce into the enforceability of arbitration agreements in employment contracts would call into doubt the efficacy of alternative dispute resolution procedures adopted by many of the Nation's employers, in the process undermining the FAA's proarbitration purposes and breeding litigation from a statute that seeks

to avoid it. The Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law; as we noted in *Gilmer*, 500 U.S. at 26, by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.

*Circuit City Stores v. Adams*, 532 U.S. 105, 122-23 (2001) (citations and internal quotations omitted). Indeed, Title VII claims may be subjected to binding arbitration. *See Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 310 (6th Cir. 1991); *cf. Cosgrove v. Shearson Lehman Bros.*, No. 95-3432, 1997 WL 4783, at *2 (6th Cir. Jan. 6, 1997) (same for ADEA claims); *Bailey v. Ameriquest Mortgage Co.*, 346 F.3d 821, 822 (8th Cir. 2003) (same for FLSA claims). The question before the court, then, is whether there are "grounds ... at law or in equity" for the revocation or non-enforcement of the agreement. *See* 9 U.S.C. § 2.

**C. Under Tennessee Law, the Arbitration Agreement was not a Contract of Adhesion**

  1.  *Tennessee Law on Contracts of Adhesion*

In Tennessee, "a contract is presumed to be made with reference to the law of the place where it was entered into unless it appears it was entered into in good faith with reference to the law of some other state." *Ohio Cas. Ins. Co. v. The Travelers Indem. Ins. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973) (citations omitted). Tennessee generally applies the *lex loci contractus*, but sometimes it applies the law of the place of performance. *See Nordahl v. Studer Revox America, Inc.*, No. 94-6336, 1996 WL 99782, at *4 (6th Cir. Mar. 5, 1996) (citing *Solomon v. FloWarr Mgmt.*, 777 S.W.2d 701, 705 n.5 (Tenn. Ct. App. 1989)). The district court correctly looked to Tennessee law, because the agreement was executed there,

Cooper's employment and the alleged harassment and discharge occurred there, and neither party expected any other state's law to apply.

The district court held that the arbitration agreement is a contract of adhesion under Tennessee law. Tennessee defines a contract of adhesion as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996) (citations omitted). The essence of adhesion is that the parties' bargaining positions and leverage enable one party to "select and control risks assumed under the contract." *See id.*; *see also* BLACK'S LAW DICTIONARY 318 (7th ed. 1999). In *Buraczynski*, the state Supreme Court held that an arbitration agreement between a doctor and a patient was a contract of adhesion where it was presented to the patient well after her course of treatment had begun. Emphasizing the special doctor-patient relationship, the court noted that if the patient declined to sign, she would have suffered an interruption in care and lost the opportunity to continue treatment with the physician whom she had come to know and trust. *See Buraczynski*, 919 S.W.2d at 320.

A contract is not adhesive merely because it is a standardized form offered on a take-it-or-leave-it basis. Even after *Buraczynski*, Tennessee courts decline to find arbitration provisions adhesive where the consumer fails to prove that refusal to sign would cause some detriment other than not being able to buy from the particular merchant (such as not being able to obtain the goods or services elsewhere). *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351 (Tenn. Ct. App. 2001), held that an arbitration agreement between a car dealer and a buyer was not adhesive, as there was no proof that the buyer's refusal to agree would cause some detriment other than being unable to come to terms with the particular dealer.

*Id.* at 359. The court reasoned, "[i]f Defendant had refused to sell Plaintiff the van, Plaintiff could have gone to another Chevrolet dealership (or any other type of dealership for that matter) and obtained a van elsewhere if he considered the Agreement unacceptable." *Id.* at 360.

Similarly, in *Wallace v. National Bank of Commerce*, 938 S.W.2d 684 (Tenn. 1997), the plaintiff contended that a customer agreement, which imposed fees for returned checks, was a contract of adhesion. *Id.* at 687. The court of appeals disagreed. The court acknowledged that the agreements had some adhesive characteristics because they were standardized forms and their execution was a precondition for opening an account. *Id.* at 687-88. Nonetheless, the court held, "these factors standing alone are not sufficient .... [P]erhaps most significantly, there is no showing in the record that the customers had no realistic choice but to acquiesce in the imposition of the bank's charges. There is no showing that the fees were the same at all the defendant banks or that banking services could not be obtained from other institutions." *Id.*

2. *Analysis of Adhesion*

   a. *Agreement was "Take-It-Or-Leave-It" Standardized Form Prepared by MRM*

The district court found that MRM prepared the agreement, a standardized form, with no negotiation or input from Cooper. *See Cooper v. MRM Inv. Co.*, 199 F. Supp. 2d 771, 778-79 (M.D. Tenn. 2002); *see also C & L Enters. v. Citizen Band, Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 423 (2001) (characterizing adhesion contract as one where a form agreement is "foisted" upon a "quiescent" party which did not prepare it). The judge also did not err in finding that Cooper had to sign the agreement to get the job. Cooper's affidavit does not expressly allege that she was told she would not get the job if she did not sign the arbitration agreement; she says only that she "was presented with several documents and was

told that [she] needed to sign the documents." *See* J.A. 40. But the packet of "several documents" which Cooper had to sign, clearly included the arbitration agreement. Attached to the brief MRM itself filed below, was a single-page photocopy containing the four short[2] documents MRM asked Cooper to sign, including the arbitration agreement and the sexual-harassment policy.

In addition, the district court recalled MRM's counsel conceding that MRM had presented the agreement as a "take-it-or-leave-it." *See Cooper*, 199 F. Supp. 2d at 778. MRM disputes that recollection:

> MRM's attorney stated that she was not present when the Arbitration Agreement was signed, had not discussed the issue with her clients, was in no position to advise the court exactly how the Arbitration Agreement was presented to Cooper, and upon repeated insistence by the court that counsel answer directly whether Cooper was required to sign the document, stated that she could only assume that Cooper's signature would have been required.

MRM's Brief at 17 n.1. Here the "judge's recollection does not contradict or impeach the record, but rather supplies an

---

[2] The case for enforcing the agreement is strengthened by the fact that it is brief and embodied in a separate document. This court has already affirmed a district court's rejection of the argument that a merchant fraudulently induced consumers to sign an arbitration agreement, as "the contract language was clear and unambiguous. The defendants presented the arbitration agreements to the plaintiffs on a separate form. The contract terms were not hidden in boilerplate language or otherwise disguised." *Stout v. Byrider*, 50 F. Supp. 2d 733, 740 (N.D. Ohio 1999), *aff'd*, 228 F.3d 709 (6th Cir. 2000), *cert. denied*, 531 U.S. 1148 (2001). *Compare Howell v. NHC Healthcare-Fort Sanders*, 109 S.W.3d 731, 734 (Tenn. Ct. App. 2003) (arbitration clause in nursing home admission agreement was unenforceable where, *inter alia*, the clause was "buried" inconspicuously on page ten of eleven-page agreement), *appeal denied* (Tenn. June 30, 2003).

omission to its contents. Therefore, it was permissible for him to rely on his own recollections regarding the substance" of the exchange. *Paschen Contractors, Inc. v. Illinois State Toll Hy. Auth.*, 590 N.E.2d 539, 543 (Ill. App.), *appeal withdrawn*, 602 N.E.2d 458 (Ill. 1992).

Moreover, no transcript was made of the hearing. *Cf. Karsch v. LaBarge*, 223 F.3d 859, 863 (8th Cir. 2000) ("Walton has provided us with no transcript or other record of the ... hearings that might support his contention that fee disgorgement was not discussed"). In the absence of a transcript, the Rules of Procedure allowed MRM to substitute a written narrative of the hearing,[3] but MRM did not do so. Absent either type of record, the Court defers to the district court's recollection, and its conclusion that Cooper was required to sign the agreement if she wanted the job. *See Adair v. United States Postal Serv.*, No. 99-3058, 1999 WL 1253039, at *1 (6th Cir. Dec. 13, 1999) ("the district court's rulings regarding the testimony simply cannot be reviewed because the record does not include a trial transcript or narrative statement."); *accord SIL-FLO v. SFHC*, 917 F.2d 1507, 1517 (10th Cir. 1990) ("without a record of the proceedings below we have no option but to defer to the district court's ruling during trial that [the] deposition did not violate its earlier order").

b. *Cooper Failed to Show She Had No Alternatives to the KFC Job*

The last element of adhesion is the absence of a meaningful choice for the party occupying the weaker bargaining position. The district court opined that "[e]specially in

---

[3] "The statement must be served on the appellee, who may serve objections or proposed amendments within 10 days after being served. The statement and any objections or proposed amendments must then be submitted to the district court for settlement and approval. As settled and approved, the statement must be included by the district clerk in the record on appeal." FED. R. APP. P. 10(c).

today's economy, the choice to 'leave it' often amounts to no choice at all. Indeed, if she 'leaves it', she probably forgoes the opportunity for employment." *Cooper*, 199 F. Supp. 2d at 778 (citation omitted). The judge relied in part on an article which chronicled an increasing trend toward arbitration clauses in employment contracts: "[P]rospective employees often have no choice at all -- that is, even if they decide to walk away from one mandatory arbitration contract, they will often have no choice but to accept another employment contract that mandates arbitration as well." *Id.* at 778 n.4 (citation omitted).

There was nothing wrong with referring to authorities for the proposition that, as a *general* matter, employers often condition employment on a commitment to arbitration. Evidence that employers around the country require such agreements as a matter of course may provide context for an employee's claim that *relevant employers in his locality* also do so. To find *this* contract adhesive, however, there must be evidence that Cooper would be unable to find suitable employment if she refused to sign MRM's agreement. She presented no such evidence. For instance, she did not allege that she looked for comparable jobs but was unable to find one. Generalizations about employer practices in the modern economy cannot substitute for such evidence. *See Andersons, Inc. v. Horton Farms*, 166 F.3d 308, 324 (6th Cir. 1998) (no procedural unconscionability where grain seller "failed to present evidence that it searched for other alternatives and that there were none").

Recent Tennessee decisions on the enforceability of exculpatory clauses illustrate the need for such party-specific evidence in an unconscionability analysis. In *Russell v. Bray*, a home inspection company required home-buyers to sign a form contract which limited its liability to the lesser of the repair cost or refund of the inspection fee. When buyers sued to invalidate the contract as violative of public policy, the court considered six factors, three of which are relevant here:

[d.] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

[e.] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

[f.] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Russell v. Bray*, 116 S.W.3d 1, 5-6 (Tenn. Ct. App. 2003) (applying *Olson v. Molzen*, 558 S.W.2d 429, 431-32 (Tenn. 1977)); *see also Childress v. Madison Cty.*, 777 S.W.2d 1, 4 (Tenn. Ct. App. 1989) (applying *Olson* factors).

The *Russell* court found that hiring inspectors is a practical necessity for many home-buyers. *Russell*, 116 S.W.2d at 7. The buyers did not provide sufficient evidence, however, on the parties' relative bargaining power and their other alternatives. The court surmised that the company *might* have had superior bargaining power that enabled it to impose an adhesive exculpatory clause. *Id.* But the record was

devoid of any evidence that would allow us to find these criteria are satisfied. Although there is evidence Plaintiffs were given the name of another home inspection service, and attempted to set up an appointment with this other inspector, there is no evidence showing whether the other inspector would have produced a contract with the same exculpatory clause. *As we are unable to determine from the record whether Plaintiffs could have used another inspector*

*without being required to sign a contract containing a similar exculpatory clause, we do not find Defendants possessed a decisive advantage of bargaining strength* against any member of the public who sought their services. * * * Based upon the record before us, we find the fourth and fifth criteria are not satisfied in this case.

*Id.* at 7-8 (emphasis added). Notably, *Russell* did not remand to afford the buyers another opportunity to present evidence on their alternatives and bargaining power. It was the buyers' burden to establish a basis for non-enforcement of their contracts, and they had not done so.

Likewise, it was Cooper's burden to establish state law grounds for non-enforcement of her agreement with MRM; she failed to do so, leaving the record silent on whether other local employers might have hired her without a similar agreement. *Cf. Beauchamp v. Great West Life Assurance Co.*, 918 F. Supp. 1091, 1098 (E.D. Mich. 1996) (reluctant to find arbitration agreement adhesive where plaintiff could work for other employers without signing such agreements). On such a record, the district court could not simply assume adhesion and procedural unconscionability based on what job applicants may encounter elsewhere. *See, e.g., Stout*, 50 F. Supp. 2d at 740 (declining to find adhesion in contract to buy used car, as such cars "are widely available from a huge number of sellers if [the buyers] found the arbitration provision unacceptable"); *Atlantic Pools & Spas, Inc. v. BellSouth Adver. & Publ'g Corp.*, 64 F. Supp. 2d 708, 712 (M.D. Tenn. 1999) (provision limiting liability for phonebook misprint was not adhesive; there was no "inordinate disparity" in bargaining power, in light of many other modes of advertising plaintiff could use); *accord Choice Hotels Internat'l v. Chewl's Hospitality*, No. 02-1855, 2003 WL 22961190, at *4 (4th Cir. Dec. 17, 2003) (franchisee properly compelled to arbitrate where it "has not demonstrated that it had no viable alternatives, or that it faced the possibility of

being excluded from the hotel franchise business if it had refused such an arbitration contract").

## D. Under Tennessee Law, the Arbitration Agreement Was Not Unconscionable

Even if the MRM arbitration agreement were adhesive, the agreement was enforceable under Tennessee law unless Cooper showed it was also unconscionable. "The common law ... subjects terms in contracts of adhesion to scrutiny for reasonableness." *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 600 (1991) (Stevens, J., dissenting o.g.). Tennessee recognizes two types of unconscionability:

Unconscionability may arise from a lack of a meaningful choice on the part of one party (procedural unconscionability) or from contract terms that are unreasonably harsh (substantive unconscionability). In Tennessee we have tended to lump the two together and speak of unconscionability resulting when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

*Trinity Indus., Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159, 170-71 (Tenn. Ct. App. 2001) (citations omitted). A contract is substantively unconscionable, then, when its terms "are beyond the reasonable expectations of an ordinary person, or oppressive...." *Buraczynski*, 919 S.W.2d at 320.

### 1. *No Basis for Finding the Agreement Procedurally Unconscionable*

The district court was troubled that MRM required an applicant to sign an arbitration agreement "precisely at the time that he or she is most willing to sign anything just to get a job." *Cooper*, 199 F. Supp. 2d at 780 and n.8. The judge

found that people seeking jobs at a fast food restaurant have, on average, a weaker bargaining position than people seeking white-collar jobs at, for instance, a brokerage firm: "While this difference is not determinative, it certainly informs the Court's thinking." *Id.* at 778 n.3. The judge contrasted brokerages because several precedents holding that employment disputes may be subject to binding arbitration involved brokers. *See Gilmer*, 500 U.S. 20; *Haskins v. Prudential Ins. Co. of Am.*, 230 F.3d 231 (6th Cir. 2000), *cert. denied*, 531 U.S. 1113 (2001); *Willis*, 948 F.2d 305.

The finding that an employee had less bargaining power *is* relevant to the procedural-unconscionability analysis. Moreover, as the district court judge implied, the disparity in bargaining power also informs the *substantive-*unconscionability analysis, because a job applicant who lacks "leverage" may be more likely to agree to unfair terms. In a close case, terms bordering on substantive unconscionability may look more unfair in light of circumstances suggesting that the stronger party pressed his advantage against the weaker party. In determining procedural unconscionability, however, the judge did not require the parties to present *evidence* on "factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, ... [and] whether the terms were explained to the weaker party...." *See Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 666 (6th Cir. 2003) (*en banc*) (citations omitted). As the record discloses, the judge made no findings on those factors. Absent such findings, there was no basis for a negative answer to "[t]he crucial question ... [of] whether each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract...." *Morrison*, 317 F.3d at 666 (citation and internal quotation omitted).

### 2. *No Basis for Finding the Agreement Substantively Unconscionable*

In turn, the district court's erroneous finding of procedural unconscionability contributed to its conclusion that the arbitration agreement's terms were unfair and the product of overreaching. Aside from the lack of support for the finding that Cooper had far inferior bargaining power, unequal bargaining power alone does not render a contract substantively unconscionable. The Supreme Court has cautioned, "[m]ere inequality in bargaining power ... is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." *Gilmer*, 500 U.S. at 33. As one court noted, "[w]hen a party ... voluntarily *agrees* to something in an attempt to obtain employment, they are not being 'forced' to do anything...." *EEOC v. Frank's Nursery & Crafts*, 966 F. Supp. 500, 504 (E.D. Mich. 1997), *rev'd o.g.*, 177 F.3d 448 (6th Cir. 1999); *accord Williams v. Parkell Prods.*, No. 03-7164, 2003 WL 23022072, at *1 (2d Cir. Dec. 24, 2003) (affirming order compelling arbitration of Title VII claims and holding that threat to terminate employment if employee did not sign arbitration agreement did not constitute duress).

While the district court's compassion for job applicants is laudable, under its approach "practically every condition of employment would be an 'adhesion contract' which could not be enforced because it would have been presented to the employee by the employer in a situation of unequal bargaining power on a 'take it or leave it' basis." *Morrison*, 70 F. Supp. 2d at 823 (quoting *Beauchamp*, 918 F. Supp. at 1098). Such a result would contravene Congress's intent that employment disputes be subject to valid arbitration agreements, unless excepted by FAA § 1 or rendered unenforceable under state contract law. For these reasons, the record does not support the conclusion that the arbitration agreement was procedurally and substantively unconscionable.

### E. The District Court Erred in Finding the Agreement Lacked Sufficient Bilaterality

The district court also held that "there is an insufficient 'modicum of bilaterality' present in this case." *Cooper*, 199 F. Supp. 2d at 780. It reasoned that "the agreement was ... drafted by KFC, and imposed on a prospective employee precisely at the time that he or she is most willing to sign anything just to get a job. Although the KFC Arbitration Agreement binds both parties, only the Defendant is aware of the ramifications of the agreement." *Id.* (citation omitted). The court erred. The district court acknowledged that the MRM agreement "does contain a measure of what ... courts have termed a 'modicum of bilaterality,'" and, unlike the agreement held unconscionable in *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889 (9th Cir.), *cert. denied*, 535 U.S. 1112 (2002), it requires both parties to arbitrate, not just the employee. *See Cooper*, 199 F. Supp. 2d at 780. Despite this, the judge found that the agreement lacked sufficient bilaterality because "there is an asymmetry born out of a difference in bargaining power that pervades the resulting arbitration agreement." *Id.* In so doing, the judge improperly conflated the procedural unconscionability and bilaterality analyses.

Even if Cooper had far less bargaining power, that would not detract from bilaterality, because MRM has the same duty to arbitrate as Cooper. *See Wilks v. Pep Boys*, 241 F. Supp. 2d 860, 863 (M.D. Tenn. 2003) ("the plaintiffs' claims that the Agreement is invalid for lack of consideration and because it constitutes an 'illusory promise' are without merit. Both parties are bound to arbitrate claims arising in their relationship....").

Moreover, the record does not support the supposition that only MRM knew the agreement's ramifications. Its defining ramification is that the parties will submit disputes to an arbitrator instead of a judge or jury. "[T]he loss of the right to a jury trial is a necessary and fairly obvious consequence

of an agreement to arbitrate." *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 492 (6th Cir. 2001) (citation omitted). Absent evidence that MRM rushed Cooper or deceived her as to the agreement's consequences, *Burden* charges her with knowledge of that central consequence. *Compare Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 383 (S.D.N.Y. 2002) (arbitration agreement was unenforceable where employer gave employee only fifteen minutes to review sixteen-page document and used other high-pressure tactics).

**F.  Lack of Express Waiver of Right to Jury Trial Did Not Render Agreement Invalid**

1.  *Burden (6th Cir. 2001)*

The district court contrasted the MRM agreement, which said nothing about waiving the right to a jury trial, with the agreement enforced in *Buraczynski*. The latter alerted the weaker party, in ten-point capitals printed in red ink directly above the signature line, "BY SIGNING THIS CONTRACT YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL ...." The district court held that the absence of such language in the MRM agreement rendered it unenforceable because "the waiver of any rights (substantive or procedural), must be both knowing and clear. * * * If the employee is not clearly made aware of the rights she is waiving, that waiver is not only invalid, but the entire agreement is rendered unduly oppressive." *Cooper*, 199 F. Supp. 2d at 775, 779.

This Court, however, has flatly rejected the claim that an arbitration agreement must contain a provision expressly waiving the employee's right to a jury trial. Without discussion, we stated, "As to the failure of the arbitration clause to include a jury waiver provision, 'the loss of the right to a jury trial is a necessary and fairly obvious consequence

of an agreement to arbitrate.'"[4] *Burden*, 267 F.3d at 492 (quoting *Sydnor v. Conseco Fin. Servs. Corp.*, 252 F.3d 302, 307 (4th Cir. 2001)); *see also Pritchard v. Dent Wizard Internat'l Corp.*, 275 F. Supp. 2d 903, 918-19 (S.D. Ohio 2003) (employee unlikely to succeed on claim that his right to jury trial superseded arbitration clauses). The Seventh Amendment confers not the right to a jury trial *per se*, but rather "only the right to have a jury hear the case once it is determined that the litigation should proceed before a court. If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes." *Bank One, N.A. v. Coates*, 125 F. Supp. 2d 819, 834 (S.D. Miss. 2001), *aff'd*, No. 01-60059, 2002 WL 663804 (5th Cir. Apr. 5, 2002); *accord Marsh v. First USA Bank*, 103 F. Supp. 2d 909, 921 (N.D. Tex. 2000) (citing *Geldermann, Inc. v. CFTC*, 836 F.2d 310, 323 (7th Cir. 1987)).[5]

2.  *KMC (6th Cir. 1985) is Distinguishable from Burden (6th Cir. 2001), Which Governs*

As discussed *supra*, *Burden* mandates reversal of the holding that the agreement is invalid because it did not

---

[4]*Wright v. Universal Maritime Servs. Corp.*, 525 U.S. 70 (1998), is not to the contrary. *Wright* held only that an arbitration clause's waiver of the right to a jury trial must be "clear and unmistakable" when the clause is contained in a collective bargaining agreement ("CBA"). *Id.* at 80. *See also Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003) (citation omitted); *see, e.g., Knox v. Wheeling-Pittsburgh Steel Corp.*, 899 F. Supp. 1529, 1537 (N.D. W.Va. 1995). Cooper does not contend that her employment was covered by a CBA. Nor has Cooper denied that the FAA applies to her arbitration agreement with MRM.

[5]Of the Circuits to squarely address the issue, all four share the view we expressed in *Burden*. *See Melton v. Philip Morris Inc.*, No. 01-35883, 2003 WL 21774035, at *2 (9th Cir. May 7, 2003); *American Heritage*, 294 F.3d at 710-11; *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002); *Koveleskie v. SBC Capital Markets*, 167 F.3d 361, 368 (7th Cir.), *cert. denied*, 528 U.S. 811 (1999).

contain an express waiver of Cooper's right to a jury trial. For that proposition, the district court relied on a pre-*Burden* panel decision: *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir. 1985). In *KMC*, the parties' contract contained a clause waiving the right to a jury trial. Nonetheless, when KMC sued for breach, the judge ordered a jury trial. He found that before the parties signed the contract, a representative of defendant told the plaintiff's president that "absent fraud, which was not present ..., the waiver provision would not be enforced." The defendant appealed, contending that the judge should have enforced the waiver of the right to a jury trial. We held that the waiver was unenforceable because it was not knowing and voluntary. *See id.* at 754-55.

At first blush *KMC* seems to conflict with our later decision in *Burden*. Both were panel decisions, and we have never addressed *en banc* the issue on which they seem to conflict. Under the law-of-the-circuit doctrine, only the Court sitting *en banc* may overrule published circuit precedent, absent an intervening Supreme Court decision or a change in the applicable law. *See Walker v. Bain*, 257 F.3d 660, 680 (6th Cir. 2001) (Daughtrey, J., concurring in part and dissenting in part o.g.); *Armco Employees Indep. Fed'n v. AK Steel Corp.*, 252 F.3d 854, 860 n.2 (6th Cir. 2001) (citing 6TH CIR. R. 206(c)).

A sister Circuit also allows the overruling of precedent "in extremely rare circumstances, where non-controlling but persuasive case law suggests such a course." *United States v. Chhien*, 266 F.3d 1, 11 (1st Cir. 2001). The Fourth Circuit decision we relied on in *Burden* could be viewed as such "non-controlling but persuasive case law." If so, *Burden* could have overruled *KMC* without expressly saying so. "Precedent-making decisions may ... be overruled ... by implication so that a later decision overrules prior decisions which conflict with it whether such prior decisions are or are not mentioned." *See Star Bank, N.A. v. Reveal (In re Reveal)*,

148 B.R. 288, 290 (Bankr. S.D. Ohio 1992).[6] Implied overrulings, however, are disfavored. *See id.* at 290-91 (citation omitted); *accord United States v. Rodriguez*, 311 F.3d 435, 439 (1st Cir. 2002), *cert. denied*, 538 U.S. 937 (2003). When possible, we will distinguish seemingly inconsistent decisions rather than find an overruling by implication. *See, e.g., Mfrs.' Indus. Relations Ass'n v. East Akron Casting Co.*, 58 F.3d 204, 210 (6th Cir. 1995). Indeed, *Burden* is distinguishable from *KMC* in three respects.

First, *KMC*'s seeming endorsement of the knowing and voluntary standard was *dictum*. The panel held, "Those cases in which the validity of a contractual waiver of jury trial has been in issue have overwhelmingly applied the knowing and voluntary standard. We are of the opinion that the Magistrate [Judge] was correct in applying the knowing and voluntary standard *in this instance*." *See KMC*, 757 F.2d at 756 (emphasis added and citations omitted). In light of the rest of the panel's analysis, its careful inclusion of the phrase "in this instance" is significant. Such language suggests a decision limited to the peculiar facts of the case. The court went on to explain that a determination of the standard governing contractual waiver of the right to jury trial, was *not* essential to its decision:

> In any event, whether the appropriate standard is that K.M.C.'s waiver must have been knowing and voluntary, or merely 'clear,' we conclude that if in fact it was represented to K.M.C.'s president Butler before the signing of the financing agreement that the jury waiver provision would not be enforced under circumstances such as those in the instant case, neither standard is met.

---

[6] *Cf. Watt v. Alaska*, 451 U.S. 259, 285 (1981) (Stewart, J., dissenting) (referring to the "established rule of statutory construction" *leges posteriores, priores contrarias abrogant*, subsequent laws repeal prior conflicting ones).

*Id.* at 757 (citations omitted). Because *KMC* did not decide whether a knowing and voluntary standard governs contractual waivers of the right to jury trial, it did not foreclose our decision in *Burden*.

Second, *KMC* based its refusal to enforce the waiver on its finding that the defendant promised the plaintiff, before they signed, that the waiver would not be enforced under the circumstances. The court emphasized, "K.M.C. is not claiming that it did not intend to waive jury trial but inadvertently failed to object to the waiver provision in the contract before signing it; [rather,] it claims that it objected strenuously and was assured that the provision would only apply in narrow circumstances." *Id.* n.6. By contrast, neither Burden nor Cooper was led to believe she would not be held to the letter of the agreement. Third, even if *KMC* announced a rule that a contractual waiver of the right to a jury trial must be "knowing and voluntary" or "clear," *Burden* is consistent with that rule. As we held in *Burden*, a party who enters an arbitration agreement necessarily consents to the clear and obvious consequence: the surrender of his right to go to trial. *Burden*, 267 F.3d at 492.

In addition to *KMC*, the district judge relied on *Trumbull v. Century Marketing Corp.*, 12 F. Supp. 2d 683 (N.D. Ohio 1998). There a woman sued her former employer for sexual harassment in violation of Title VII, and the employer invoked an arbitration clause contained in the employee handbook. The court held the clause unenforceable on three grounds: (1) there was no mutuality of obligation, because the handbook authorized the employer to "modify, augment, delete, or revoke any and all policies" therein at any time; (2) the employee did not knowingly waive her right to litigate, because the clause occupied less than two pages of a sixty-page handbook, was not set apart from provisions which did not affect her rights, and said nothing about arbitrating statutory claims as opposed to contractual disputes; and (3) the clause barred the arbitrator from awarding punitive

damages, depriving the employee of a remedy she could seek in court. *See id.* at 685-88.

None of the grounds that justified non-enforcement in *Trumbull* obtains here. As to mutuality of obligation, the MRM agreement obligates both parties to arbitrate and does not give MRM the right to change the agreement unilaterally. As to the "clear" or "knowing and voluntary" character of the waiver of a judicial forum, the MRM agreement is short, clear and embodied in a separate document, not buried in a lengthy handbook which addresses issues not affecting Cooper's rights. Moreover, unlike *Trumbull*, the MRM agreement specifically advised Cooper that she would be required to arbitrate sexual-harassment claims. Lastly, the MRM agreement does not restrict the arbitrator's authority to award punitive damages or any other remedy Cooper might obtain in court.

## G. District Court's Statement that Title VII Claims Belong in Federal Court

The district court acknowledged that employers face many non-meritorious claims and that arbitration can offer greater efficiency and convenience than litigation. Without citing authority, however, the district court expressed hostility to the arbitration of employment discrimination claims:

These cases do not 'clog' the federal docket – they belong in federal court. Employees must not be forced to either forgo employment or forgo their right to a day in court, and Courts must not use the perceived problems associated with employment discrimination [cases] to prevent employees, and society at large, from vindicating the rights that Congress enshrined in the Civil Rights Acts.

*Cooper*, 199 F. Supp. 2d at 779 n.7. Yet the Supreme Court holds that "having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an

intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Gilmer*, 500 U.S. at 26 (citation omitted). The district court did not adduce evidence of a Congressional intent to prohibit employees from waiving a judicial forum for discrimination or harassment claims, and we find none.

On the contrary, the 1991 Amendments to Title VII "evince[] a clear congressional intent to make arbitration an alternative method of dispute resolution." *Rajjak v. McFrank & Williams*, No. 01 Civ. 0493, 2001 WL 799766, at *2 n.2 (S.D.N.Y. July 13, 2001) (citation omitted). The amendment provided, in part, "Where appropriate and to the extent authorized by the law, the use of alternative means of dispute resolution including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." *DeGaetano v. Smith Barney*, No. 95 Civ. 1613,1996 WL 44226, at *5 (S.D.N.Y. Feb. 5, 1996) (quoting Civil Rights Act of 1991, § 118, Pub. L. No. 102-66, nn. after 42 U.S.C.A. § 1981). Accordingly, we decided that Congress did not intend to exclude Title VII claims from arbitration. *See Willis*, 948 F.2d at 310. Nonetheless, the district court indulged its belief that employers should not be allowed to require arbitration of statutory discrimination claims. That belief is incompatible with the strong congressional policy favoring arbitration. As this Court has held, "the fact that some of plaintiff's claims are based upon Title VII, a federal civil-rights statute, does not affect the enforceability of the arbitration agreement. It is well-settled that statutory claims may be the subject of an arbitration agreement enforceable under the FAA." *Cosgrove*, No. 95-3432, 1997 WL 4783, at *2 (citing *Gilmer*, 500 U.S. at 26).

## H. Was the Agreement Invalid Because Arbitration Would Be Prohibitively Expensive?

Unlike the findings that the agreement was adhesive, unconscionable, and insufficiently bilateral, the district court's other basis for finding the agreement unenforceable

was potentially valid: under the AAA rules incorporated in the agreement, arbitration could be prohibitively expensive, deterring employees like Cooper from attempting to vindicate their rights. As a matter of public policy, the court rightly rejected MRM's argument that the agreement was enforceable because it is willing to pay Cooper's arbitration costs. An employee should not have to "jump through hoops" to show arbitration is too costly, only to have the employer jettison the unduly burdensome cost-splitting provision when it is challenged.

The AAA has since amended its rules, however, to hold employers responsible in the first instance for all expenses except a small filing fee and costs for the employee's witnesses. This may make it more difficult for Cooper to show her likely arbitration costs are prohibitively high, as she must to invalidate the agreement under *Green Tree Finance Corp. of Alabama v. Randolph*, 531 U.S. 79 (2000) and *Morrison v. Circuit City*, 317 F.3d 646 (6th Cir. 2003) (*en banc*).

### 1. When Arbitration Costs Render an Arbitration Agreement Unenforceable

In *Green Tree Finance Corp. of Alabama v. Randolph*, 531 U.S. 79 (2000), the Supreme Court adopted a case-by-case approach to determining whether an arbitration agreement's cost-splitting provision denies potential litigants the opportunity to vindicate their rights. "[W]here ... a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* at 92. The agreement before the Court said nothing about arbitration costs, and the employee produced little evidence on the costs she was likely to incur and whether she could afford them. Accordingly, the Court found the plaintiff had not met her burden of proving she would actually bear prohibitive costs if required to arbitrate. The Court held,

It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, [the record] contains hardly any information on the matter. * * * The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

. . .

To invalidate the agreement on that basis would undermine the "liberal federal policy favoring arbitration agreements." It would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.

*Id.* at 91-92 (citations omitted). Because the employee made no showing about his likely arbitration costs, the Court declined to specify "[h]ow detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence ...." *Id.* at 92. Further guidance is available from our subsequent *en banc* decision in *Morrison v. Circuit City*, where we declared,

We hold that potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum. Our approach differs from the case-by-case approach advocated in *Bradford* [*v. Rockwell Semiconductor Systems*, 238 F.3d 549, 556 (4th Cir. 2001)] by looking to the possible "chilling effect" of the

cost-splitting provision on similarly situated [potential] litigants, as opposed to its effect merely on the actual plaintiff in the given case.

* * *

A particular plaintiff may be determined to pursue his or her claims, regardless of costs. But a court considering whether a cost-splitting provision is enforceable should consider similarly situated potential litigants, for whom costs will loom as a larger concern, because it is, in large part, their presence in the system that will deter discriminatory practices. Nothing in *Green Tree* suggests that a case-by-case analysis should not treat similar cases similarly.

For this reason, **if the reviewing court finds that the cost-splitting provision would deter a substantial number of similarly situated potential litigants, it should refuse to enforce the cost-splitting provision in order to serve the underlying functions of the federal statute.** In conducting this analysis, the reviewing court should define the class of such similarly situated potential litigants by job description and socioeconomic background. It should take the actual plaintiff's income and resources as representative of this larger class's ability to shoulder the costs of arbitration.

*Morrison*, 317 F.3d at 663 (emphasis added); *see also DeOrnellas v. Aspen Square Mgmt.*, 295 F. Supp. 2d 753 (E.D. Mich. 2003) (holding arbitration agreement's cost-sharing provision unenforceable under *Morrison*).

The court must evaluate the likely cost of arbitration not in absolute terms, but *relative to the likely costs of litigation*. The up-front expense of litigation is often minimal, because many employee-plaintiffs can secure a contingency fee agreement where counsel advances discovery costs and defers collection of fees until judgment. *See Morrison*, 317 F.3d at

664. Conversely, a plaintiff "forced to arbitrate a typical $60,000 employment discrimination claim will incur costs ... that range from three to nearly *fifty* times the basic costs of litigating in a judicial, rather than arbitral, forum." *Id.* at 669 (citation omitted). Furthermore, because Title VII allows compensatory damage awards up to $300,000, the costs of arbitrating such a claim will range "higher and higher." *Id.*

Finally, the analysis of likely arbitration costs must consider only "up-front" costs, not the lower cost that may ultimately result if the arbitrator relieves the employee of costs presumptively imposed by AAA rules (e.g., if the employee prevails on the merits). *See id.* at 664. After all, it is the out-of-pocket costs an employee considers when deciding whether he can afford arbitration:

> The issue is whether *the terms of the arbitration agreement itself* would deter a substantial number of similarly situated employees from bringing their claims in the arbitral forum, and thus the court must consider the decision-making process of these potential litigants. In many cases, if not most, employees considering the consequences of bringing their claims in the arbitral forum will be inclined to err on the side of caution, especially when the worst-case scenario would mean not only losing on their substantive claims but also the imposition of the costs of the arbitration.

*Id.* at 664-65 (emphasis added) (citations omitted).

### 2. *The Employee's Likely Up-Front Costs under the Former AAA Rules*

The district court found that Cooper earned $7,253.74 in 2001 and that she "and others similarly situated, often cannot afford to pay the high costs of arbitration." *See Cooper*, 199 F. Supp. 2d at 781. There is no suggestion that Cooper has undisclosed assets or sources of income, or that her income has increased to a meaningful extent. Accordingly, the court

did not err in determining that Cooper was likely to incur significant up-front costs under the then prevailing AAA rules which she would not incur in court. This comports with our comment that "many, if not most" employment plaintiffs who litigate their claims will be represented under contingency agreements, paying neither fees nor costs until and unless they secure judgment. *See Morrison*, 317 F.3d at 664.

Nor did the district court err in finding such costs would deter many employees in Cooper's circumstances from arbitrating their claims. We predicted, after all, that courts would regularly find arbitration costs too high to permit enforcement of a lower- or middle-income employee's duty to arbitrate. The courts "will find, in many cases, that high-level managerial employees and others with substantial means can afford the costs of arbitration, thus making cost-splitting provisions in such cases enforceable. *In the case of other employees, however, this standard will render cost-splitting provisions unenforceable in many, if not most, cases*." *Id.* at 665 (emphasis added and citations omitted).

### 3. *District Court Properly Rejected MRM's Offer to Pay Cooper's Arbitration Costs*

The Cooper-MRM agreement contained no provision stating that an invalid or unenforceable clause could be severed. The district court held that, in the absence of a severability provision, it could not enforce the clause requiring arbitration while simultaneously invalidating the cost-splitting provision (and allowing MRM to relieve Cooper of her contractual obligation to pay some arbitration costs would effectively treat the arbitration cost-splitting provision was invalid). The court's ruling on this issue was sound under both Tennessee law and federal common law.

Under Tennessee law, the court could not make a new contract for the parties by adding a term, such as a severability clause. *See Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 37 (Tenn. 1984) (*cited in Warren v.*

*Metropolitan Gov't of Nashville & Davidson Cty.*, 955 S.W.2d 618, 623 (Tenn. Ct. App. 1997)). The Court could not invent a severability clause in order to "red-line" the cost-splitting provision while enforcing the clause requiring Cooper to arbitrate in the first place.[7]

The district court's decision on this issue was also sound as a matter of federal public policy. As the Eleventh Circuit reasoned, "To sever the costs and fees provision and force the employee to arbitrate a Title VII claim despite the employer's attempt to limit the remedies available would reward the employer for its actions and fail to deter similar conduct by others." *Perez v. Globe Airport Sec. Servs.*, 253 F.3d 1280, 1287 (11th Cir. 2001), *vac'd by* 294 F.3d 1275 (11th Cir. 2002). *But see Gannon v. Circuit City Stores*, 262 F.3d 677, 683 n.8 (8th Cir. 2001) (questioning *Perez*). Under the contrary approach, an employer "will not be deterred from routinely inserting such a deliberately illegal clause into the arbitration agreement it mandates for its employees if it knows that the worst penalty for such illegality is the severance of the clause after the employee has litigated the matter." Brief of Amicus Curiae EEOC at 14-15 (citation omitted). Our *en banc* decision in *Morrison* made clear that the district court's decision to reject MRM's offer to pay was the proper course. *See Morrison*, 317 F.3d at 676-77; *accord Gourley v. Yellow Transp.*, 178 F. Supp. 2d 1196, 1203-1205 (D. Colo. 2001) (rejecting employer's offer to waive a contractual cost-splitting provision).

Moreover, MRM's offer was an impermissible attempt to vary the terms of a contract. There was neither a meeting of the minds nor consideration to support such a *post hoc*

unilateral amendment of the agreement. *See Popovich v. McDonald's Corp.*, 189 F. Supp. 2d 772, 779 (N.D. Ill. 2002) (accepting defendant's offer to pay all arbitration costs, contrary to contract, would effectively allow it to unilaterally modify contract).

### III. CONCLUSION

For the foregoing reasons, we reverse on all issues except one: whether the likely costs of arbitration are so high that they will deter Cooper or similarly situated employees from exercising their right to arbitrate. On that issue we vacate and remand for the court to analyze the likely arbitration costs under the AAA's rules prevailing on the date that MRM filed its motion in district court to compel Cooper to arbitrate.[8]

---

[7]Similarly, the Supreme Court has held, "What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 281 (1995) *(quoted in Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 357 (Tenn. Ct. App.), *appeal denied* (Tenn. 2001)).

[8]Under our decision in *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003) (*en banc*), the relevant costs are Cooper's out-of-pocket costs, without reference to the possibility that she may later recoup some of them. Hence the district court shall consider neither the arbitrator's possible award of fees and expenses to Cooper pursuant to the AAA Rules, nor MRM's offer to pay Cooper's arbitration costs.