Carlos **MOUNTS** and **Randy T. Everhart, Jr.**, on behalf of plaintiffs and their proposed class, Plaintiffs,

v.

**MIDLAND FUNDING LLC, and Midland Credit Management, Inc., Defendants.**

No.: 3:15–CV–572–TAV–HBG

United States District Court, E.D. Tennessee.

Filed 06/28/2017

---

**45.** Notes 40, 41 *supra* also apply to the tortious interference with business relations claim asserted against Cutter.

Peter A. Holland, The Holland Law Firm, P.C., Annapolis, MD, Alan C. Lee, Talbott, TN, for Plaintiffs.

Alan D. Leeth, Robert Franklin Springfield, Burr & Forman LLP; Birmingham, AL, John Christopher Suedekum, Burr & Forman LLP, Nashville, TN, for Defendants.

## MEMORANDUM OPINION AND ORDER

Thomas A. Varlan, CHIEF UNITED STATES DISTRICT JUDGE

This civil action is before the Court on defendants' Motion to Compel Arbitration and to Dismiss [Doc. 14]. Plaintiffs filed a response in opposition to defendants' motion [Doc. 17], and defendants replied [Doc. 21]. For the reasons discussed herein, the Court will grant in part and deny in part defendants' motion.

## I. Background [1]

Plaintiffs Carlos Mounts and Randy T. Everhart, Jr. filed this action against defendants Midland Funding LLC ("Midland Funding") and Midland Credit Management, Inc. ("Midland Credit"); alleging that defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692

---

1. The Court only includes facts relevant to its determination of defendants' motion to compel arbitration and to dismiss.

et seq. ("FDCPA"). Defendants now move to compel arbitration of plaintiffs' claims, alleging that plaintiffs agreed to arbitrate such claims when they assented to the terms of their credit card agreements. The Court will first address the facts associated with Mounts's credit account and will then turn to Everhart's credit account.

## A. Mounts's Account

On or about April 28, 2004, Mounts opened a Citi Dividend Platinum Select MasterCard account (the "Citi Account") with Citibank (South Dakota), N.A. [Doc. 14–1 pp. 3–4]. A Citibank Card Agreement governs the account, which sets forth certain details regarding the account, including repayment terms, interest and fee clauses, and various other terms [*Id.* at 4, 16–19]. The Citibank Card Agreement also includes an arbitration clause [*Id.* at 18–19]. The agreement provides that it is "binding on you unless you close your account with 30 days after receiving the card and you have not used or authorized use of the card" [*Id.* at 16]. Mounts made purchases on the Citi Account after he opened it [*Id.* at 5, 21–64]. He made his last payment on the account in September 2010, and he continued charging purchases to the account until only a few months before the account was charged off in April 2011 [*Id.*].

Pursuant to a Bill of Sale and Assignment dated March 28, 2013, Citibank sold a portfolio of charged-off accounts to Midland Funding, which included Mounts's Citi Account [*Id.* at 3–4, 8–14]. Midland Funding, a wholly-owned subsidiary of Midland Credit, thereafter placed and assigned the Citi Account to Midland Credit for servicing [*Id.* at 2, 4].

## B. Everhart's Account

Everhart opened a Bass Pro Shops credit card account with GE Money Bank ("GEMB") on or about September 3, 2006 (the "GEMB Account") [Doc. 14–2 pp. 3–4]. The GEMB Credit Card Agreement governs the GEMB Account, which sets forth certain provisions applicable to the account, including repayment, interest, an arbitration provision, and other terms [*Id.* at 4, 7–10; Doc. 14–1 p. 7]. The GEMB Credit Card Agreement was mailed to Everhart when he opened the GEMB Account [Doc. 14–2 p. 4]. The agreement states: "Your signature on this application or sales slip for the initial purchase approved on this Account represents your signature on this Agreement and is incorporated by reference" [*Id.* at 9]. Everhart charged purchases at Bass Pro Shops for months after opening the GEMB Account [*Id.* at 4, 12–93].

Pursuant to a Bill of Sale dated February 23, 2010, GEMB sold a portfolio of charged-off accounts, which included Everhart's GEMB Account, to CACH, LLC [*Id.* at 5; Doc. 14–3 pp. 2–3]. Thereafter, pursuant to an Assignment and Bill of Sale dated February 24, 2010, CACH, LLC sold the pool of accounts to Asset Acceptance, LLC [Doc. 14–4 pp. 2, 5, 7–8]. Asset Acceptance, LLC later sold a portfolio of accounts, including the GEMB Account, to Midland Funding on October 14, 2013, which placed and assigned the GEMB Account to Midland Credit for servicing [*Id.* at 2, 10–14; Doc. 14–1 pp. 5–6].

## II. Legal Standards

■ The Federal Arbitration Act ("FAA") "expresses a strong public policy favoring arbitration in a broad range of disputes." *Cooper v. MRM, Inc.*, 367 F.3d 493, 498 (6th Cir. 2004). It provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a valid arbitration agreement governs a claim, courts must compel arbitration. *Id.* §§ 3–4.

Federal law creates "a general presumption of arbitrability, and any doubts are to be resolved in favor of arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 576–77 (6th Cir. 2003) (quoting *AT & T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). "If parties contract to resolve their disputes in arbitration rather than in the courts, a party may not renege on that contract absent the most extreme circumstances." *Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir. 2000).

"Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable." *Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003). If the "validity of the agreement to arbitrate is 'in issue,' the court must proceed to a trial to resolve the question." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). The burden is on the party opposing arbitration to show that the agreement is not enforceable. *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91–92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). In order to meet this burden, "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate, a showing that mirrors the summary judgment standard." *Great Earth*, 288 F.3d at 889.

As plaintiffs are opposing arbitration, they must offer "concrete evidence from which a reasonable juror could" find that this matter should not be compelled to arbitration. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[M]ere conclusory and unsupported allegations, rooted in speculation, do not meet that burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (citation omitted).

### III. Analysis

When considering a motion to compel arbitration, a court has four tasks. *Stout*, 228 F.3d at 714. The Court must determine: (1) "whether the parties agreed to arbitrate"; (2) "the scope of that agreement"; (3) "if federal statutory claims are asserted, . . . whether Congress intended those claims to be nonarbitrable"; and (4) whether to dismiss the action or stay the remainder of the proceedings pending arbitration. *See id.* The Court will address these four tasks in turn.

### A. Whether the Parties Agreed To Arbitrate

In determining whether parties agreed to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Courts also look to state law to determine whether contract defenses may invalidate arbitration agreements. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). However, questions concerning the interpretation and construction of arbitration agreements are governed by federal substantive law. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

In determining whether the parties agreed to arbitrate, the Court will proceed by addressing: (1) whether defendants provided admissible evidence to support the existence of the arbitration agreements; (2) whether plaintiffs generally assented to the agreements; (3) the effect of delegation provisions; and (4) plaintiffs'

challenges to the enforceability of the agreements.

### 1. Evidence of the Agreements

Plaintiffs assert that the documents defendants rely on to support the existence of the arbitration agreements are inadmissible hearsay. They also point out that the documents defendants submitted to support the existence of Mounts's arbitration agreement actually postdate Mounts's account by six years. Plaintiffs assert that this is evidence that the documents are not actually associated with Mounts's account and are, therefore, irrelevant. The Court will address these objections in turn.

### i. Hearsay Objections

 Plaintiffs argue that the Court should deny defendants' motion because the documents defendants attached to their motion are hearsay and because defendants have not shown that these documents meet the required elements of the business records exception set forth in Federal Rule of Evidence 803(b)(6). In support of their motion to compel, defendants attached a number of documents, including bills of sale and assignments, affidavits corresponding to such bills of sale and assignments, credit card agreements, and account statements [Docs. 14–1–14–4]. Plaintiffs generally argue that "the documents offered by Defendants to show written agreements are hearsay" [Doc. 17 p. 11].

As the underlying foundation for these documents, defendants submitted the declaration of Mike Burger, the Director, Operations, LC–Legal Collections Operations for Midland Credit. Mike Burger's declaration states:

> Some of the business records I reviewed, including some of the business records attached hereto, were created by businesses other than Midland Credit. On information and belief, all of these records were made by, or from information transmitted by, a person with knowledge of the events described therein, at or near the time of the event described, were kept in the ordinary course of the regularly conducted business activity of such persons, and it is the regular practice of those business activities to make and rely upon such records. These records have been incorporated into the business records of Midland Credit and are routinely relied upon by Midland Credit in conducting its business [Doc. 14–1 p. 3].

According to plaintiffs, because Burger's statement was made on information and belief, it falls short of the requirement that the affidavit be based on personal knowledge.

 When a business incorporates records it did not create, such documents are admissible under Rule 806(6) "based on the foundation testimony of a witness with first-hand knowledge of the record keeping procedures of the incorporating business, even though the business did not actually prepare the document." *Fambrough v. Wal–Mart Stores, Inc.*, 611 Fed.Appx. 322, 329 (6th Cir. 2015). Here, although Burger submits that he does not have direct knowledge as to the creation of the records, he testifies that they "have been incorporated into the business records of Midland Credit and are routinely relied upon by Midland Credit in conducting its business" [Doc. 14–1 p. 3]. He further testifies that he is "responsible for, among other things, maintaining and overseeing 'media,' i.e., the loan agreements, account purchase and transfer information, debt collection records, and other account information pertinent to accounts and debts that Midland Credit manages for Midland Funding" [*Id.* at 2–3]. As such, it appears that Burger has personal knowledge of defendants' recordkeeping procedures and that Midland Credit has incorporated the records into its own business records.

Based on this declaration, the Court may properly consider the documents defendants submitted to support the existence of the arbitration agreements under the business records exception to the rule against hearsay. *See Bey v. Midland Credit Mgmt., Inc.*, No. GJH-15-1329, 2016 WL 1226648, at *5 (D. Md. Mar. 23, 2016) (finding that evidence falls under Rule 803(6) when the declarant "relied on some business records that were created by businesses other than [the defendants]" and the declarant "explained that such records have been incorporated into [the defendants'] business records 'and are relied upon by them in conducting their business' "). Accordingly, the Court finds that plaintiffs' conclusory assertion that these documents are not business records is without merit. As plaintiffs provide no further argument as to why these documents are inadmissible hearsay, the Court will overrule plaintiffs' objection based on hearsay and will not exclude any of the documents defendants submitted on this basis.

### ii. Date on Mounts's Agreement

▇▇▇ Plaintiffs also submit that the documents defendants presented are not associated with Mounts's account because the credit card agreement defendants submitted has a copyright designation of 2010, and Mounts opened his account with Citibank in 2004 [Doc. 17 pp. 16–17].

As Mike Burger provides in his declaration, however, the 2010 agreement is the one applicable to Mounts's account [Doc. 14–1 p. 4], and the agreement provides that it "is binding on you unless you close your account within 30 days after receiving the card and you have not used or authorized used of the card" [*Id.* at 16]. In addition, the arbitration provision itself states that all "Claims arising in the past, present, or future, including Claims arising before the opening of your account, are subject to arbitration" [*Id.* at 19]. Further-

more, Mounts used and/or made payments on the account for years after opening it, and he continued to do so well into 2010 [*Id.* at 5, 21–64].

The Court further notes that plaintiffs have not produced any evidence that the 2010 agreement does not govern Mounts's account. As such, the Court will overrule plaintiffs' objection based on the 2010 date. *See Coppock v. Citigroup, Inc.*, No. C11-1984-JCC, 2013 WL 1192632, at *4 (W.D. Wash. Mar. 22, 2013) (overruling the plaintiff's objection that the defendant did not produce the agreement the plaintiff entered into when she opened the account in 1994 because "the relevant agreement is the one in effect in October 2001", and the plaintiff produced no evidence that the 2001 agreement "is *not* the agreement that governed her account in October 2001").

Having found that plaintiffs' objections as to the admissibility of the credit agreements and other documents are without merit, the Court now turns to whether the parties executed agreements under the applicable state laws.

### 2. General Assent to the Agreements

▇▇▇ In determining whether parties formed an agreement, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944, 115 S.Ct. 1920. Notably, plaintiffs here do not analyze whether the circumstances surrounding the formation of Mounts or Everhart's agreements constitute assent under the governing state laws.

### i. Mounts's Agreement

▇▇▇ Mounts's agreement provides that federal law and the law of South Dakota govern the terms of the agreement [Doc. 14–1 p. 19]. In determining whether there is a valid contract between a credit card holder and issuer, South Dakota law provides the following:

The use of an accepted credit card or the issuance of a credit card agreement and the expiration of thirty days from the date of issuance without written notice from a card holder to cancel the account creates a binding contract between the card holder and the card issuer with reference to any accepted credit card, and any charges made with the authorization of the primary card holder.

S.D. Codified Laws § 54–11–9.

Here, Mounts's agreement provides that it is "binding on you unless you close your account with 30 days after receiving the card and you have not used or authorized use of the card" [Doc. 14–1 p. 16]. Mounts used the Citi Account by making purchases on the account after it was opened, and he continued to do so after receiving the 2010 agreement [*Id.* at 5, 21–64]. These circumstances satisfy the criteria set forth in § 54–11–9 for the formation of a credit card agreement. *See Cayanan v. Citi Holdings, Inc.*, 928 F.Supp.2d 1182, 1199 (S.D. Cal. 2013) ("Under South Dakota law, because [the plaintiff] used both cards after receiving the cardmember agreements, she assented to the arbitration agreements ...."); *see also Ackerberg v. Citicorp USA, Inc.*, 898 F.Supp.2d 1172, 1176 (N.D. Cal. 2012) ("Numerous courts have found that continued use or failure to opt out of a card account after the issuer provides a change in terms, including an arbitration agreement, evidences the cardholder's acceptance of those terms."). As such, pursuant to South Dakota law, the Court finds that Mounts assented to the terms of the credit card agreement.

### ii. Everhart's Agreement

■ Everhart's agreement states that "Utah law shall apply to the extent state law is relevant under Section 2 of the FAA in determining the validity of this provision" [Doc. 14–2 p. 9]. In determining whether Everhart assented to the terms of the agreement under Utah law, the following provisions apply:

(e) A credit agreement is binding and enforceable without any signature by the party to be charged if:

(i) the debtor is provided with a written copy of the terms of the agreement;

(ii) the agreement provides that any use of the credit offered shall constitute acceptance of those terms; and

(iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered.

Utah Code Ann. § 25–5–4(2)(e).

In this case, Everhart was mailed a copy of the agreement containing the arbitration provision when he opened the GEMB Account and was afforded the "Right to Reject Arbitration" [Doc. 14–2 p. 4]. The agreement states: "Your signature on this application or sales slip for the initial purchase approved on this Account represents your signature on this Agreement and is incorporated by reference" [*Id.* at 9]. Furthermore, Everhart charged purchases at Bass Pro Shops for months after opening the account [*Id.* at 4, 12–93].

These circumstances satisfy the criteria outlined in § 25–5–4(2)(e). *See Khanna v. Am. Express Co.*, No. 11 Civ 6245(JSR), 2011 WL 6382603, at *3 (S.D.N.Y. Dec. 14, 2011) (finding that an arbitration clause in a cardmember agreement valid under Utah law where the agreement provided that use of the card constitutes assent, the plaintiff was mailed a copy of the agreement, and the plaintiff used the card); *see also Wold v. Dell Fin. Servs.*, 598 F.Supp.2d 984, 987–88 (D. Minn. 2009). As such, under Utah law, the Court finds that

Everhart assented to the terms of the credit card agreement.

### iii. Parties to the Agreement

■ Plaintiffs contend that even if the Court finds that arbitration agreements exist, Midland Credit cannot enforce those agreements because it is not a party to them. Plaintiffs do not dispute, however, that Midland Funding is a party to the agreements.

■ Despite the "liberal federal policy favoring arbitration agreements, such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract." *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (internal citation omitted). In general, arbitration is a "matter of consent," and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

Mounts's agreement states: "Claims made by or against anyone connected with us or you" are subject to arbitration, including claims made by or against any "affiliated company" [Doc. 14–1 pp. 4–5, 18]. The arbitration provision in Everhart's agreement also extends to "affiliates" [Doc. 14–2 p. 8]. As such, under the plain terms of the agreements, plaintiffs agreed to submit any dispute against Midland Funding's affiliates to arbitration.

While the agreements do not contain definitions for "affiliated company," or "affiliates," plaintiffs contend that "a corporate affiliate is commonly defined as 'a type of inter-company relationship in which one of the companies owns less than a majority of the other company's stock'" [Doc. 17 p. 5]. Plaintiffs further assert that because "Midland Funding is a wholly-owned subsidiary of Midland Credit," Midland Credit does not meet this definition of

corporate affiliate and, therefore, does not fall under the arbitration agreements [*Id.* (citing Doc. 14–1 p. 2)].

Plaintiffs, however, provide no source for their suggested definition of "corporate affiliate." In contrast, as defendants point out, Black's Law Dictionary defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Black's Law Dictionary (10th ed. 2014). Based on this definition and the opinions of several other courts, it appears that Midland Credit qualifies as an affiliate of Midland Funding and may, therefore, enforce the arbitration agreements even if it is not a party to the agreements. *See, e.g., Harris v. Midland Credit Mgmt., Inc.*, No. 15-4453, 2016 WL 475349, at *2 (D.N.J. Feb. 8, 2016) (finding that because Midland Credit "is Midland Funding's affiliate tasked with collecting on Plaintiff's delinquent account," it falls within the arbitration agreement providing that claims subject to arbitration include those directly related to "a parent company, affiliated company, and any predecessors and successors"); *see also Lloyd v. Midland Funding, LLC*, 639 Fed.Appx. 301, 301 (6th Cir. 2016) (referring to Midland Credit and Midland Funding as "affiliates"); *Madden v. Midland Funding, LLC*, 786 F.3d 246, 248 (2d Cir. 2015) ("Midland Credit Management, Inc. . . . . is an affiliate of Midland Funding that services Midland Funding's consumer debt accounts.").

As such, the Court finds that, because Midland Credit is Midland Funding's "affiliate," Midland Credit may properly invoke the arbitration provisions.

### 3. Delegation Provisions

Defendants assert that the arbitration agreements contain delegation provisions, which delegate certain issues of arbitrability to the arbitrator. Having found that the

parties generally assented to the credit agreements, the Court next considers what effect, if any, the alleged delegation provisions have on its analysis.

A party has the right to judicial determination of the issue of arbitrability, unless the parties "clearly and unmistakably provide otherwise." *AT & T Techs.*, 475 U.S. at 649, 106 S.Ct. 1415. A "delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement," such as the interpretation, validity, scope, and enforceability of the arbitration agreement. *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 68, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010). The Court, therefore, will consider whether Mounts and Everhart's agreements clearly and unmistakably provide for the arbitrators to decide threshold issues of arbitrability.

### i. Mounts's Agreement

The arbitration provision in the Citi Agreement states: "All Claims relating to your account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision" [Doc. 14–1 p. 18]. The Sixth Circuit addressed an identical provision in *Danley v. Encore Capital Grp.*, 680 Fed.Appx. 394, 2017 WL 710470 (6th Cir. 2017), and found that it was a valid delegation provision. *Id.* at 397–99, 2017 WL 710470, at *3–4. As such, in accordance with Sixth Circuit precedent the Court finds that the delegation provision in Mounts's agreement clearly and unmistakably provides that the arbitrator should decide the application, enforceability, or interpretation of the agreement and the arbitration provision.

### ii. Everhart's Agreement

As to Everhart's agreement, defendants contend that, because the agreement contains language requiring the ar-

bitrator to follow either the American Arbitration Association ("AAA") or the National Arbitration Forum's ("NAF") rules, the parties have expressed a clear and unmistakable intent to have an arbitrator decide the issue of arbitrability.

Under the title "Applicable Law," Everhart's agreement states as follows:

These terms involve interstate commerce and this arbitration provision is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"). Utah law shall apply to the extent state law is relevant under Section 2 of the FAA in determining the validity of this provision. The arbitrator has to follow: (1) the substantive law, consistent with the FAA, that would apply if the matter had been brought in court, (2) this arbitration provision, and (3) the administrator's rules [Doc. 14–2].

The agreement also provides that the administrator of the arbitration can be either NAF or AAA [*Id.*]. As the applicable law section includes "the administrator's rules," defendants assert that Mounts's agreement incorporates the rules of the AAA and NAF. The applicable rules for these organizations expressly provide that the arbitrator has the authority to decide his or her own jurisdiction, including issues regarding the existence, validity, and scope of the agreement to arbitrate [Doc. 14–5 p. 3; Doc. 14–7 p. 3]. Defendants argue that by invoking these rules, the parties clearly and unmistakability intended to invoke the arbitrator's stated authority to resolve issues related to arbitrability.

The Court notes that "[t]he Sixth Circuit has not yet addressed whether reference to an organization's rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability." *Howard v. Rent–A–Center, Inc.*, No. 1:10-CV-103, 2010 WL 3009515, at *4 (E.D. Tenn. July

28, 2010). In determining whether to accept defendants' argument, the Court finds the *Howard* case instructive. In *Howard*, another court in this district considered whether the following provision was a valid delegation provision:

> The Company and I agree that, except as provided in this Agreement, any arbitration shall be in accordance with the then-current National Employment Arbitration Procedures of the AAA or equivalent (if AAA is designated), the then-current JAMS Employment Arbitration Rules or equivalent (if JAMS is designated), the then-current NAF Code of Procedure (if NAF is desiganted [sic]), or the applicable rules of any other service to which the parties mutually agree.

*Id.* at *3 n.1. The court concluded based on this provision that the parties "clearly and unmistakable [sic] delegated arbitrability by referencing the rules of the AAA, JAMS, and NAF in their agreement." *Id.* at *4. In doing so, the court noted that while the Sixth Circuit has yet to address the issue, "all of the circuit courts of appeals to have considered this issue have held that it does." *Id.* (citing cases from several circuit and district courts). Here, the Court finds, like the court in *Howard*, that by referencing the rules of AAA and NAF, the parties have clearly and unmistakably delegated issues of arbitrability to the arbitrator.

Having found that both Mounts and Everhart's agreements contain delegation provisions, the Court now turns to plaintiffs' arguments against the enforceability of the arbitration agreements.

### 4. Plaintiffs' Arguments Against Enforceability of the Agreements

The Supreme Court has provided that a party seeking to avoid the effects of a delegation provision must challenge that provision specifically and, if it fails to challenge that provision, courts should enforce it as written. *Rent–A–Center*, 561 U.S. at 72, 130 S.Ct. 2772. Plaintiffs assert in this case that the arbitration agreements are not enforceable because: (1) plaintiffs did not knowingly and voluntarily waive their constitutional right to a jury trial; (2) there are no arbitrators available to arbitrate plaintiffs' claims; and (3) defendants did not comply with a FAA notice requirement. Although plaintiffs do not direct these arguments to the delegation provisions specifically, the Court finds that their arguments appear to apply to the delegation provisions with equal force, as plaintiffs do not raise these arguments as traditional state law contract formation defenses, and instead rely on federal constitutional law and the FAA. Consequently, although both arbitration agreements contain delegation provisions, the Court will address plaintiffs' arguments in turn, out of an abundance of caution.

#### i. Knowing and Voluntary

■ Plaintiffs assert that the Court should deny defendants' motion because defendants have not met their burden of showing that plaintiffs knowingly and voluntarily waived their right to a jury trial. In response, defendants assert that the knowing and voluntarily standard does not apply to the enforceability of the jury trial waivers contained in the arbitration agreements at issue.

■ The Seventh Amendment of the U.S. Constitution preserves the right to a jury trial in suits at common law. U.S. Const. amend. VII. The question of waiver of the right to a jury trial is governed by federal, not state, law. *See K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755–56 (6th Cir. 1985). The right to a jury trial may be waived "by prior written agreement" by "the parties to a contract." *Id.* at 755.

In support of their contention that a contractual waiver of the right to a jury

trial must be knowing and voluntary, plaintiffs cite to the Sixth Circuit's decision in *K.M.C. K.M.C.* involved a contractual provision in which the plaintiff .agreed to "waive all right to a trial by jury". and did not involve an arbitration provision or the FAA. *Id.* at 755. While the Sixth Circuit stated in *K.M.C.* that the knowing and voluntary standard was. appropriate "in this instance," it did not base its holding on that standard. *Id.* at 757 (holding that even if the standard for waiver is "clear," the standard was not met).

In addition, since its holding in *K.M.C.*, the Sixth Circuit has provided that "the loss of the right to a civil jury trial is a 'fairly obvious consequence' of failing to object to an arbitration clause and, therefore, does not require an express waiver." *Robert Bosch Corp. v. ASC Inc.*, 195 Fed. Appx. 503, 507 (6th Cir. 2006) (quoting *Cooper*, 367 F.3d at 506). The Sixth Circuit has further provided that, rather than applying federal common law, courts should apply state-law contract defenses in determining the validity of arbitration agreements. *Stutler v. T.K. Constructors Inc.*, 448 F.3d 343, 345 (6th Cir. 2006); *see also Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) ("Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation.").[2]

As such, the Court finds that the state-law contract defenses, rather than the federal right to a trial by jury, should govern the enforcement of the delegation provision. Plaintiffs' arguments regarding the

knowing and voluntary standard . are, therefore, inapplicable to this matter.

### ii. Availability of Arbitrators

 Plaintiffs also argue that the Court should deny defendants' motion because "none of the arbitration forums designated by the alleged arbitration provisions are willing or able to conduct such arbitration" [Doc. 17 p. 6].

Mounts's agreement states as follows: "The .party filing an arbitration must choose one of the following two arbitration firms and follow its rules and procedures for initiating and pursuing an arbitration: [AAA] or JAMS" [Doc. 14–1 p. 19]. Everhart's agreement provides: "The person who starts the arbitration proceeding must chose an administrator, which can be either [NAF] ... or the [AAA] .... The actual arbitrator will be selected under the administrator's rules, and must be a lawyer with at least ten years of experience" [Doc. 14–2 p. 8].

In response to defendants' motion, plaintiffs· provide evidence and arguments in support of their contention that the AAA, NAF, and JAMS are not willing or able to conduct this arbitration [*See* Doc. 17 pp. 6–11]. Defendants dispute these assertions and further argue that even if the AAA, NAF, and JAMS all decline to administer the arbitration, then 9 U.S.C. § 5 provides a mechanism for the Court to designate an arbitrator, and plaintiffs would still be obligated to arbitrate their claims [Doc. 21 pp. 7–12]. Section 5 of the FAA states that if, for· any reason, there is "a lapse in the naming of an arbitrator or arbitrators ... then upon the application of either party to

---

**2.** Although the Sixth Circuit has held otherwise in *Cooper*, 367 F.3d 493, and *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003), the court has since expressly "limited [its] holdings in *Morrison* and *Cooper* to the validity of arbitration agreements in employment agreements where an employee's

statutorily created federal civil ·rights are at issue." *See Stutler*, 448 F.3d at 345. Here, plaintiffs' claims do not arise from an employment agreement or seek to vindicate federal rights arising under "anti-discrimination legislation." *Id.*

the controversy the court shall designate and appoint an arbitrator or arbitrators ... who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein." 9 U.S.C. § 5.

The Northern District of Illinois faced similar circumstances to those of the instant case in *Jackson v. Payday Loan Store of Illinois, Inc.*, No. 1:09-cv-4189, 2010 WL 1031590 (N.D. Ill. Mar. 17, 2010). In *Jackson*, the plaintiffs argued that the three organizations named as possible arbitrators in the agreement—the NAF, AAA, and JAMS—were not available to arbitrate the dispute and, consequently, that the court should not compel arbitration in the case. *Id.* at *4. Citing § 5 of the FAA, the court determined that "[e]ven if none of the three named arbitrators in the Agreement are willing to administer the arbitration of this dispute, the FAA itself provides a mechanism by which that gap may be willed and the Agreement upheld." *Id.* The court further found that because "the arbitration agreement offers a choice of arbitrators, the selection of a single particular arbitrator cannot logically be so central to the agreement as to merit voiding it." *Id.* The court, therefore, rejected the plaintiffs' argument and compelled arbitration. *Id.* at *4–5.

In support of their claim that defendants' motion should be denied because none of the arbitration firms listed are available, plaintiffs cite to *Beverly Enterprises v. Cyr*, 608 Fed.Appx. 924 (11th Cir. 2015). In that case, however, the Eleventh Circuit addressed an arbitration provision stating that the arbitration should be resolved in accordance with the NAF Code of Procedure and further provided that if that code was cancelled, any party "may seek legal and other remedies." *Id.* at 925. The court found that the NAF code was effectively cancelled and that the parties could seek "legal and other remedies" be- cause the NAF code was "integral" to the agreement. *Id.* As such, the court vacated the district court's order compelling arbitration. *Id.* Plaintiffs also cite to *Moss v. First Premier Bank*, 835 F.3d 260 (2d Cir. 2016). In *Moss*, however, the Second Circuit determined that "[w]here a forum is exclusive," a district court cannot use § 5 to "circumvent the parties' designation of an exclusive arbitral forum." *Id.* at 265–67.

Here, in contrast to *Beverly Enterprises* and *Moss*, both Mounts and Everhart's agreements list multiple arbitration firms that could administer the claims. In addition, plaintiffs have made no showing that the naming of these specific arbitration firms is integral to the agreements. As such, even if plaintiffs are correct that none of the listed arbitrators in Mounts and Everhart's agreements are available to arbitrate the claims, the Court finds that plaintiffs may be compelled to arbitrate their claims. *See Jackson*, 2010 WL 1031590, at *4.

### iii. Notice Requirement

Finally, plaintiffs argue that the Court should deny defendants' motion because defendants failed to comply with the notice requirement of the FAA. They contend that because defendants did not serve "notice of an application to arbitrate the issues raised in the Complaint five (5) days prior to the filing of the Motion, they failed to comply with the requirements of the [FAA]" and, in particular, 9 U.S.C. § 4 [Doc. 17 pp. 17–18].

Section 4 of the FAA is not applicable, however, to cases "where the plaintiff has already brought an action in court." *See Weinstein v. Equitable Life Assurance Soc'y of U.S.*, No. 2:96-cv-3614, 1996 WL 557321, at *3 (E.D. Pa. Sept. 26, 1996). Instead, § 4 "applies only when a party brings an independent action 'whose sole purpose is to compel arbitration.'" *Id.*

(quoting *Zosky v. Boyer*, 856 F.2d 554, 556 (3d Cir. 1988)). By contrast, "[w]hen a proceeding already has been initiated in court, section 3 of the FAA provides the mechanism for staying that proceeding pending arbitration." *Id.* at *4; *see also Hall v. Shearson Lehman Hutton, Inc.*, 708 F.Supp. 711, 712–13 (D. Md. 1989) ("Section 4 does not apply to cases such as this, which are not originally commenced by the party seeking to compel arbitration." (internal footnote omitted)).

"Unlike section 4 of the FAA, section 3 does not have a notice requirement." *Weinstein*, 1996 WL 557321, at *4. Consequently, defendants had no obligation to provide "[f]ive days' notice" to plaintiffs before filing their motion to compel. *See id.* (providing that "there was no procedural deficiency on the part of defendants in not providing notice to plaintiff" before filing their motion to compel arbitration). As such, the Court finds that plaintiffs' argument as to notice has no bearing on the enforceability of the delegation provision. The Court, therefore, turns to the scope of the agreement.

### B. Scope of the Agreement

Plaintiffs argue that their FDCPA claims are not within the scope of the arbitration agreements because they are unrelated to the matters covered by the agreements. As the Court has found that the parties delegated gateway issues of arbitrability to the arbitrators—including the scope of the arbitration agreement—the Court finds that the arbitrator should determine whether the FDCPA claims fall within the scope of the agreements. The Court, therefore, turns to its next inquiry, that is, whether Congress intended the federal statutory claims to be nonarbitrable.

### C. Whether Congress Intended FDCPA Claims To Be Nonarbitrable

Plaintiffs allege FDCPA claims in their complaint. "Congress did not intend FDCPA claims to be non-arbitrable." *Hodson v. Javitch, Block & Rathbone, LLP*, 531 F.Supp.2d 827, 831 (N.D. Ohio 2008) (granting third-party debt collector's motion to compel FDCPA claims to arbitration). Indeed, "[c]ourts routinely permit arbitration of such claims." *Id.* (citing *Liedtke v. Frank*, 437 F.Supp.2d 696 (N.D. Ohio 2006); *Lamb v. Javitch, Block & Rathbone, L.L.P.*, No. 1:04-cv-520, 2005 WL 4137778 (S.D. Ohio Jan. 24, 2005)). As such, the Court finds that Congress did not intend plaintiffs' claims to be nonarbitrable.

Having completed its first three inquiries, the Court finds it appropriate to compel this matter to arbitration. The Court, therefore, turns to its final inquiry—whether to stay or dismiss this matter.

### D. Whether To Stay Case or Dismiss Claims

Defendants move the Court to dismiss plaintiffs' claims, while plaintiffs urge the Court to stay this matter pending arbitration. The FAA provides that if a dispute is governed by an arbitration agreement, then a court shall stay the trial "until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Where all claims are subject to mandatory arbitration, however, courts may dismiss the action rather than staying it. *See Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000).

Here, however, the Court has not actually determined the scope of the arbitration agreement, and plaintiffs raise a question as to whether the arbitrators listed in the agreements will be available to arbitrate their claims. Consequently, there is a possibility that the parties could seek as-

sistance from the Court during the arbitration proceedings, and if the arbitrator concludes that plaintiffs' claims fall outside the scope of their agreements, they would have the right to return to this Court to prosecute those claims. As such, the Court finds that staying this action pending arbitration is appropriate. *See Howard,* 2010 WL 3009515, at *4 (staying the action after compelling arbitration because the court did not determine the scope of the agreement); *Brooks v. Finish Line, Inc.,* No. 3:05-0715, 2006 WL 1129376, at *8 (M.D. Tenn. Apr. 26, 2006) (staying the action after compelling arbitration because "there exists the possibility that the parties to the arbitration could conceivably seek assistance from the Court").

## IV. Conclusion

For the reasons discussed herein, the Court **GRANTS in part and DENIES in part** defendants' Motion to Compel Arbitration and to Dismiss [Doc. 14], in that it **COMPELS** plaintiffs to arbitrate their claims against defendants, and **STAYS** this action pending arbitration. Moreover, the parties are **DIRECTED** to file joint status reports every <u>sixty (60) days</u> informing the Court of the progress in arbitration.

IT IS SO ORDERED.